Opinion for the Court filed by Circuit Judge TATEL.
Opinion- concurring in part and concurring in the judgment filed by Senior Circuit Judge'WILLIAMS.
TATEL, Circuit Judge:
Appellant alleges that her employer, the United States Department of Health and Human Services, denied her a promotion and a transfer in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. The district court granted summary judgment for the government. For the reasons set forth below, we reverse in part and affirm in part.
I.
At the start of President George W. Bush’s Administration, plaintiff Vernard Evans, a fifty-four-year-old African American, worked as a GS-13 Developmental Disabilities Program Specialist in the Administration on Developmental Disabilities (ADD), a division of HHS’s Administration for Children and Families (ACF). At all times relevant to this litigation, Evans’s direct supervisor was Leola Brooks. Until July 27, 2001, Commissioner Sue Swenson, a holdover from the Clinton Administration, managed ADD. After Swenson left ADD, Deputy Commissioner Reginald Wells served as Acting Commissioner until Bush Administration appointee Patricia Morrissey became Commissioner on August 27, 2001.
Immediately upon entering office, the Bush Administration imposed a hiring freeze. Then, when Tommy Thompson became HHS Secretary in February 2001, he issued a memorandum requiring managers to “defer decisions to fill positions at the GS-13 through SES levels until I have had the opportunity to review staff deployment throughout the Department.”
Despite the hiring freeze, in March 2001, outgoing Commissioner Swenson recommended the creation of a GS-14, non-supervisory Lead Developmental Disabilities Specialist (LDDS) position. Shortly thereafter, Evans applied for and was interviewed for that position. On July 17, Brooks selected. Evans and another African American for two LDDS positions. But because of the hiring freeze, neither selectee was promoted. Swenson declined to push for formal approval of the LDDS position, believing that her successor should make the final decision.
Over the next few months, the new Administration replaced the hiring freeze with a series of hiring “controls.” Specifically, in October 2001, Assistant Secretary for Administration and Management Ed Sontag published a memorandum requiring . his approval for any promotions to positions at GS-14 and above. In November 2001, Assistant. Secretary for Children and Families Wade Horn issued a memorandum rescinding the requirement that Assistant Secretary Sontag approve promotions for all non-supervisory GS-14 and GS-15 positions. The memo nonetheless required Horn’s approval for promotions to GS-13 and above. And in March 2002, Horn announced at an “All Hands Meeting” that the hiring freeze was no longer in effect.
Despite the relaxation of the hiring controls, Evans was never promoted to the LDDS position, and she retired in April 2002. The record reveals that no official— Clinton holdover or Bush newcomer — gave final authorization for the LDDS position. *619 The record is unclear as to who, if anyone, made the affirmative decision to cancel the position.
Both before and after her retirement, Evans sought to find out why she had not been promoted. She claims that HHS human resources officials told her that her promotion would be pushed through after the hiring controls were removed. Evans’s union representative was told that the promotion never occurred because of the hiring controls and that the LDDS position was “officially cancelled” in March 2002. Evans also sought the assistance of United States Senator Paul Sarbanes, and in response to an inquiry from the Senator’s office, Assistant Secretary Horn stated that “Evans could not be placed in the [LDDS] position because ACF was under Departmental and agency hiring controls and the position could not be filled. ADD subsequently elected to cancel the vacancy announcement, thereby nullifying the selection recommendation.” Finally, responding to Evans’s Freedom of Information Act request, HHS revealed that at least three white employees were promoted notwithstanding the hiring controls.
Significantly for this case, one of those white employees, Faith McCormick, was detailed as a GS-15 Executive Assistant to incoming Commissioner Morrissey. Mor-rissey hand-selected McCormick for the detail, doing so without a competitive-selection process or opportunity for anyone else to apply. McCormick’s detail lasted for 154 days, after which she was permanently selected for the position, this time following a competitive process.
After exhausting her administrative remedies, Evans filed suit in the United States District Court for the District of Columbia under Title VII of the- Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. As relevant to this appeal, Evans alleged that two personnel actions — HHS’s failure to promote her to the newly created LDDS position and Morrissey’s selection of McCormick for a detail as her Executive Assistant — were infected by race and age discrimination. The district court granted summary judgment to the government on all claims. Regarding the LDDS position, the district court found that Evans failed to establish a prima facie case of discrimination, but following this Circuit’s directive in Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C.Cir.2008), it went on to address the ultimate question of discrimination and held that Evans failed to rebut the government’s legitimate, non-discriminatory reason for not promoting her — that the LDDS position was cancelled administratively. Regarding the Executive Assistant position, the district court concluded that the denial of the detail did not qualify as an adverse employment action. See Stewart v. Ashcroft, 352 F.3d 422, 426 (D.C.Cir.2003) (explaining that an adverse action is a prerequisite for a Title VII claim).
Evans now appeals. Because her briefs make no effort to advance her age discrimination claims, they are waived. See Ark Las Vegas Restaurant Corp. v. NLRB, 334 F.3d 99, 108 n. -4 (D.C.Cir.2003) (noting that arguments not raised in' briefs are waived).
II.
We review the district court’s grant of summary judgment de novo, viewing the evidence in the light most favorable to Evans and drawing all reasonable inferences accordingly. See Salazar v. Washington Metropolitan Area Transit Authority, 401 F.3d 504, 507 (D.C.Cir.2005). We will affirm only if no reasonable jury could find in Evans’s favor. See id.
*620 In Title VII cases, we traditionally follow the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). But where, as here, the employer has put forward a legitimate, non-discriminatory explanation for its decision, the McDonnell Douglas inquiry distills to one question: “Has the employee produced sufficient evidence for a reasonable jury to find that the employer’s asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race ... ?” Brady, 520 F.3d at 494; see also Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C.Cir.2008) (explaining that “the prima-facie-case aspect of McDonnell Douglas is irrelevant when an employer has asserted a legitimate, nondiscriminatory reason for its decision”). “We consider this question ‘in light of the total circumstances of the case,’ asking ‘whether the jury could infer discrimination from the combination of (1) the plaintiffs prima facie case; (2) any evidence the plaintiff presents to attack the employer’s proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff ... or any contrary evidence that may be available to the employer.’”, Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C.Cir.2012) (quoting Aka v. Washington Hospital Center, 156 F.3d 1284, 1289, 1291 (D.C.Cir.1998) (en banc)). Employees may cast doubt on the employer’s proffered reason by, among other things, pointing to “changes and inconsistencies in the stated reasons for the adverse action; the employer’s failure to follow established procedures or criteria; the employer’s general treatment of minority employees; or discriminatory statements by the decisionmaker.” . Brady, 520 F.3d at 495 n. 3.
A.
We start with Evans’s claim that she was denied the LDDS position because of her race. In support, she argues that the government’s proffered reason is pretext because HHS “has given different explanations for the cancellation at different times,” because “[n]o one admits to making the decision to cancel the promotion,” and because “the evidence shows that ... several white employees (and no African-Americans) were promoted” during the hiring controls. Appellant’s Br. 13. Evans also cites record evidence of allegedly racially insensitive remarks. For its part, the government argues that the LDDS position went unfilled because it never found a champion in the new Administration. The position therefore “died a quiet administrative death, due directly to the hiring controls.” Appellee’s Br. 22. The government further contends that the Secretary’s varying explanations are attributable to the gradual shift from a hiring freeze to hiring controls. Despite the gov: ernment’s protestations, we believe that Evans has produced sufficient evidence that, when taken together, could lead a reasonable jury to conclude that the Secretary’s proffered reason for cancelling the LDDS position was pretext for racial discrimination. See Lathram v. Snow, 336 F.3d 1085, 1088 (D.C.Cir.2003) (“[T]o survive summary judgment the plaintiff must show that-a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.” (emphasis added)).
To begin with, as Evans points out, the government has given shifting reasons for the non-promotion. For example, Evans testified that she was .told, she would be promoted once the hiring freeze was lifted, only to learn later that the position had been administratively cancelled after the hiring freeze ended. See Geleta v. Gray, *621 645 F.3d 408, 413 (D.C.Cir.2011) (commenting that “shifting and inconsistent justifications are probative of pretext” (internal quotation marks omitted)). Evans also points out that Horn’s letter to Senator Sarbanes explaining that Evans could not be promoted because of the hiring controls omits a key fact — that Horn could have approved Evans’s promotion. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (explaining that a jury “can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose”). Moreover, record evidence indicates that the relevant decision-makers have taken different views on who precisely cancelled the LDDS position. Acting Commissioner Wells testified that he discussed the LDDS position with Morrissey and that she expressed no interest in creating the position. Morrissey, by contrast, testified that she had no role in the final cancellation of the LDDS position because all GS-14 positions were “removed” from her consideration and “no longer existed.” Indeed, as the Secretary implicitly concedes, it is unclear who cancelled the LDDS position. See Appellee’s Br. 9 (“The proposed positions were eventually cancelled administratively, though the record does not provide much detail on precisely how that happened.”).
To be sure, as the government argues, there may well be a benign explanation for these shifting rationales: HHS’s reasons changed as the hiring freeze morphed into hiring controls. And it may even be, again as the government argues, that the omission from the Sarbanes letter was immaterial. But we need not decide whether these shifting and inaccurate explanations are, by themselves, sufficient for Evans to survive summary judgment because documents released in response to her FOIA request revealed that the hiring controls the government claims prevented her elevation to the LDDS position posed no barrier to the promotion of at least three white employees.
On this point, Cones v. Shalala, 199 F.3d 512 (D.C.Cir.2000), is instructive. There, an African American plaintiff was denied a promotion that went to a white employee who was lateralled into the position. The Secretary relied on an Executive Order mandating a reduction in the number of GS-14 and GS-15 employees as its legitimate, non-discriminatory rationale. But despite the Executive Order, white GS-14s — including the white employee selected for the position sought by the plaintiff — were promoted during that period. Given this, we concluded that “a jury could infer that HHS deliberately misread the Executive Order to favor [the white employee] because it preferred not to promote an African American.” Id. at 520. So too here. Once the hiring freeze was lifted in late 2001, Horn or Sontag could have approved the LDDS position and promoted Evans. Instead, as in Cones, HHS promoted whites, but not African Americans.
The government has no direct response to Cowes — indeed, its brief fails to even cite the decision. Instead, the government argues that the promoted whites were not similarly situated to Evans. This misses the point. As to this claim, Evans cites the promotion of white employees as evidence that the hiring controls were not insurmountable, not that she was discrimi-natorily denied one of those positions. Thus, while the government may be correct that the LDDS position met a “quiet administrative death,” Appellee’s Br. 22, this still begs the Cones question of why Evans never found a champion and why only white employees found champions. According to our concurring colleague, the white employees’ promotions are not in *622 consistent with the government’s explanation that the hiring controls were “not an impermeable barrier” and “at most” demonstrate that “the government’s initial explanation [w]as imprecise.” Concurring op. at 627. But the point of Cones is not that the white employees’ promotions establish that the government gave an imprecise explanation but rather that a reasonable jury could infer that the promotion of white employees — but not African Americans — during the hiring controls is evidence of pretext. See Cones, 199 F.3d at 520 (“Because the record contains evidence that downsizing had not prevented the Department from promoting white GS-14s, a jury could conclude that downsizing was pretext for discrimination.”).
Finally, Evans has produced evidence regarding behavior by Morrissey and McCormick that a reasonable jury could interpret as racially insensitive. Debbie Powell, Morrissey’s highest-ranking African American subordinate, testified at her deposition that Morrissey frequently referred to the African American women on staff as “those sisters.” Cf. Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (per curiam) (explaining that use of the term “boy” to refer to African Americans can be evidence of racial animus under certain circumstances). And in her declaration, Powell recounts an incident in which McCormick implied that people from “the Hood” are-liars and cheaters. After Powell and McCormick got into an argument over these comments, McCormick tried to explain her behavior by stating: “I’m a hot-blooded Italian and I get angry sometimes.” According to Powell, Morrissey failed to respond immediately to these remarks — though Morrissey eventually reprimanded McCormick. Powell also claims that she was involuntarily detailed out of ADD by Morrissey after she complained about McCormick’s behavior.
Given this additional evidence, Evans’s argument about the government’s shifting and inaccurate explanations becomes more salient. For example, a reasonable jury knowing that HHS promoted three whites notwithstanding the hiring controls could be quite suspicious about why the LDDS position was administratively cancelled even though Evans was initially told she would be promoted after the hiring freeze ended. Likewisé, a jury, knowing not only about the white employees' but also that Morrissey referred to African Americans as “those sisters,” could reasonably find that Morrissey was dissembling when she disavowed her involvement in the decision-making process.
In the end, the record supports two plausible interpretations of what happened. One view, urged by Evans, is that Morrissey decided not to create the position because Evans and another African American had been selected to fill the two spots. The other view, urged by the government, is that no one in the incoming Administration championed the creation of the LDDS position. As an appellate court reviewing the district court’s grant of summary judgment, we have no authority to choose between these competing views. Given our “obligation to draw reasonable inferences in [Evans’s] favor,” Salazar, 401 F.3d at 509, and given the record evidence that HHS (1) promoted whites but not African Americans during the hiring controls, (2) offered inconsistent and inaccurate explanations, and (3) is unable to identify who cancelled the LDDS position, a reasonable jury, especially in light of Powell’s testimony about Morrissey’s and McCormick’s comments, could find the Secretary’s proffered explanation to be nothing more than a veil for racial discrimination. Ultimately, this is precisely the type of factual dispute that “must be resolved in a jury room rather than in the *623 pages of the Federal Reporter.” Czekalski v. Peters, 475 F.3d 360, 362 (D.C.Cir.2007).
B.
This brings us to Evans’s second .claim: that she was denied the detail to the Executive Assistant position because of her race. In granting summary judgment to the government, the district court concluded that the denial of the detail did not qualify as an adverse action. We need not address this issue, however, because, as the government urges, we can affirm on an alternative ground, i.e., that Evans has failed to rebut the government’s proffered, non-discriminatory reason. See EEOC v. Aramark Corp., 208 F.3d 266, 268 (D.C.Cir.2000) (explaining that “because we review the district court’s judgment, not its reasoning, we may affirm on any ground properly raised”).
Once again, the parties disagree about whether the government has provided a consistent and legitimate explanation. Evans contends that Morrissey gave shifting explanations for selecting McCormick ■ for the detail and emphasizes Morrissey’s admission that she sought a Republican “confidant” as her Executive Assistant. See 5 U.S.C. § 2302(b)(1)(E) (prohibiting personnel actions based on “political affiliation”). Evans also asserts that proper protocols were not followed in McCormick’s selection.
But the government points to a key fact: Morrissey first met Evans in August 2001. Because Morrissey selected McCormick for the Executive Assistant detail prior to this date, the government’s argument goes, the record contains no evidence of racial discrimination. Thus, even though Morrissey gave conflicting and illegitimate reasons for selecting McCormick and even though proper protocols were not followed, Evans cannot establish that the Secretary’s proffered reasons were pretext for racial discrimination.
Evans has two responses. She first claims that this argument is waived because, she says, the government failed to raise it in the district court. But the government did argue in the district court that Morrissey had never met Evans prior to August 2001. See, e.g., Defendant’s Memorandum in Support of Motion for Summary Judgment at 16 (“There is no evidence that Commissioner Morrissey even knew the plaintiff at all at the time she was considering accepting the appointment to ADD and filling the Executive Assistant position or asking Ms. McCormick to detail to the position.”). Second, Evans contends that nothing in the record “supports the idea that Morrissey did not know Evans’ race when she selected McCormick as hér Executive Assistant.” Appellant’s Reply Br. 21 n.5 (emphasis added). Of course, as Evans emphasizes, an individual could quite plausibly know another person’s race before meeting them. But here, the record contains no evidence that Morrissey selected McCormick because she was white or that prior to August 2001 Morrissey was even aware of Evans’s existence, much less her race.
'Although Evans contends that McCormick’s selection as the Executive Assistant was procedurally flawed and infected with partisan motives, she must still provide sufficient evidence that the government’s proffered explanation is pretext for racial discrimination. See 42 U.S.C. § 2000e~ 16(a) (“All personnel actions affecting employees or applicants for employment ... shall be made free from any discrimination based on race....”). Because Evans has failed to make that showing, we affirm the district court’s grant of summary judgment for the government on the Executive Assistant detail claim.
*624 III.
For the foregoing reasons, we reverse in part and affirm in part.

So ordered.