# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 13, 2013　　　Decided November 15, 2013

No. 11-5115

DIANNA JOHNSON, ET AL.,
APPELLEES

RUBBIYA MUHAMMED, ET AL.,
APPELLANTS

v.

GOVERNMENT OF THE DISTRICT OF COLUMBIA AND TODD
DILLARD, INDIVIDUALLY AND OFFICIALLY, UNITED STATES
MARSHAL, D.C. SUPERIOR COURT,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-02364)

———

*William Charles Cole Claiborne III* argued the cause for
appellants. With him on the briefs were *Barrett S. Litt* and *Paul
J. Estuar*. *Lynn E. Cunningham* entered an appearance.

*Robin M. Meriweather*, Assistant U.S. Attorney, argued the
cause for appellee Todd Dillard. With her on the brief were
*Ronald C. Machen*, *Jr.*, U.S. Attorney, and *R. Craig Lawrence*
and *W. Mark Nebeker*, Assistant U.S. Attorneys.

*Stacy L. Anderson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee District of Columbia. With her on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General. *Louis A. Kleiman* entered an appearance.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

TATEL, *Circuit Judge*: Concerned that contraband poses significant dangers to inmates and employees, many penal institutions strip search incoming detainees. The appropriateness of these invasive procedures doubtless looks different from the perspective of detainees such as Appellants—women forced to endure strip searches while awaiting presentment hearings at the District of Columbia Superior Court. Alleging that such searches violate the Fourth Amendment and, where men are not similarly strip searched, the Fifth Amendment's equal protection guarantee, these women filed this class action against the District of Columbia and the former United States Marshal for the Superior Court who administered the Superior Court cellblock. Because men and women at the cellblock are now strip searched only upon individualized reasonable suspicion, we have no occasion to consider whether the policies under which class members were strip searched may continue. Rather, the only question in this case is whether class members can recover damages from the District or from the former Superior Court Marshal. The district court granted summary judgment to the District, concluding that because the Superior Court Marshal in

charge of the cellblock was at all times a federal official acting under color of federal law, the city had no authority to prevent the strip searches. The district court also granted summary judgment to the Superior Court Marshal, finding him entitled to qualified immunity. We affirm both rulings.

## I.

Under the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VII, § 7608(a)(1), 102 Stat. 4181, 4512–15 (1988) (codified at 28 U.S.C. §§ 561–569), two United States Marshals serve the District of Columbia. The first, the U.S. Marshal for the District of Columbia, serves the U.S. District Court and this Court. 28 U.S.C. § 566(b). The second, the U.S. Marshal for the District of Columbia Superior Court, serves that court only. 28 U.S.C. § 561(c). During the time of the events at issue in this case, Appellee, Todd Dillard, served as Superior Court Marshal.

Sometime in the mid- to late-1990s, Dillard, concerned that detainees were bringing weapons, drugs, and other contraband into the cellblock, began requiring all incoming detainees to undergo a three-step search. Detainees first passed through metal detectors; they were then patted down by deputy marshals; and, finally, they were required to remove their clothing, squat, and cough to dislodge any hidden contraband. The parties refer to these "drop, squat, and cough" searches as strip searches. Given that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we infer from the evidence presented that despite Dillard's facially gender-neutral policy, deputy marshals in fact subjected male detainees to strip searches only upon individualized reasonable suspicion. By contrast, all women were forced to drop, squat, and cough. This included female pre-presentment arrestees charged with non-violent, non-drug offenses. After completing the three-step

search process, female pre-presentment arrestees proceeded to interview rooms outside presentment courtrooms. Roughly eighty percent of female arrestees were released following these hearings.

In 2002, a class of women detained and strip searched at the Superior Court cellblock filed this suit seeking damages and injunctive relief. After the United States Marshals Service halted strip searches without individualized reasonable suspicion, class members abandoned their claims for injunctive relief and filed an amended complaint in which they sought only monetary relief from the District of Columbia and Dillard, whom they sued in his personal and professional capacities. The District and Dillard separately moved to dismiss the complaint for failing to state any claims upon which relief could be granted. The district court denied both motions and certified two classes: a Fourth Amendment Class and a Fifth Amendment Class. The Fifth Amendment Class includes all female pre-presentment arrestees held at the Superior Court cellblock between December 2, 1999 and April 25, 2003 and subjected to strip searches "under similar circumstances for which men arrestees were not." *See Johnson v. District of Columbia*, 584 F. Supp. 2d 83, 86 (D.D.C. 2008). The Fourth Amendment Class includes all female pre-presentment arrestees who, during the same time period, were strip searched without individualized reasonable suspicion or probable cause and who were arrested for non-drug, non-violent offenses. *See id.*

Following class certification, the district court entered summary judgment in favor of the District. Believing that the Superior Court Marshal is a federal official who acted at all times under color of federal law, and that the District therefore had no choice but to turn pre-presentment arrestees over to the

Marshal, the court concluded that the District could not be held liable for any unconstitutional acts of the Marshal. *Id.* at 90–93.

After further discovery, the district court orally granted Dillard summary judgment on all claims against him in his professional capacity, finding that his status as a federal official left him beyond the reach of 42 U.S.C. § 1983. *See Johnson v. District of Columbia*, 780 F. Supp. 2d 62, 68 (D.D.C. 2011) (describing this holding). Several months later, the district court, finding Dillard entitled to qualified immunity, granted him summary judgment on all claims against him in his personal capacity. As for the claims of Fourth Amendment Class members, the district court, relying on our recent decision in *Bame v. Dillard*, 637 F.3d 380 (D.C. Cir. 2011), where we rejected similar Fourth Amendment claims brought by male detainees against the very same Marshal Dillard, *see id.* at 382, concluded that any Fourth Amendment rights Dillard might have violated were insufficiently clearly established at the time of the violation. *Johnson*, 780 F. Supp. 2d at 73–75. As for the claims of Fifth Amendment Class members, the court, relying on *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), found no Equal Protection violation because nothing in the record indicated that Dillard intended to treat women differently from men. *Johnson*, at 780 F. Supp. 2d at 79–81.

On appeal, class members press their claims against the District and Dillard, but only in his personal capacity. We review the district court's grants of summary judgment *de novo*, viewing the evidence in the light most favorable to class members. *See, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). We first consider whether class members may hold the District liable for Dillard's conduct. Then, taking the Fourth and Fifth Amendment claims separately, we consider whether Dillard is entitled to qualified immunity.

## II.

Members of both the Fourth and Fifth Amendment Classes seek to hold the District of Columbia liable under 42 U.S.C. § 1983 for the Superior Court Marshal's conduct. As the Supreme Court explained in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipalities can be held liable under section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. at 694. Conceding that no express District policy gave rise to their injuries, class members offer two theories—the "organic theory" and the "entrustment theory"—to explain how the District might nonetheless be liable under section 1983 for Dillard's conduct.

Organic Theory

According to this theory, the Superior Court Marshal's Office is "part of the organic government of the District of Columbia just as much as the Mayor, City Council and Superior Court." Appellants' Br. 44 (emphasis omitted). Claiming that the Superior Court is best understood as a state court, not a federal court, class members argue that the Superior Court Marshal derives his authority from "the inherent powers of the Superior Court." Appellants' Br. 50. Insofar as the Superior Court Marshal "handles pre-presentment arrestees . . . as the policy maker for the District, by delegation from the policymaker, or pursuant to a widespread custom or practice in which the District of Columbia acquiesced," Appellants' Br. 44, class members urge us to find the District liable under section 1983 for any unconstitutional acts of the Marshal.

But we agree with the district court that the Superior Court Marshal is not a District official. Rather, the Superior Court

Marshal "logically and expressly derives" his authority from federal law, specifically the Anti-Drug Abuse Act of 1988. *See Johnson*, 584 F. Supp. 2d at 90. Pursuant to that Act, "[t]he President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia." 28 U.S.C. § 561(c). Like all other U.S. Marshals, the Superior Court Marshal "shall be an official of the Service and shall serve under the direction of the Director," *id.*, who "shall supervise and direct the United States Marshals Service in the performance of its duties." 28 U.S.C. § 561(g). Each U.S. Marshal serves a four year term unless he resigns or is removed by the President. 28 U.S.C. § 561(d). Thus, Dillard, as Superior Court Marshal, was appointed and confirmed through a federal process, served as part of a federal agency under the direction of a federal official, and at all times could have been removed by the President. Under these circumstances, Dillard was hardly as much "part of the organic government of the District of Columbia . . . as the Mayor." Appellants' Br. 44 (emphasis omitted).

Acknowledging that the Superior Court Marshal qualifies as a federal official for purposes of appointment and removal, class members nonetheless argue that he derives no authority from federal law. But why would Congress create a U.S. Marshal's office for a particular court and yet deny the holder of that office any federal authority? Class members have no answer, nor do we. Instead, class members find this bizarre result implicit in two provisions of the Anti-Drug Abuse Act. They first point to section 566(a), which outlines the "primary role and mission of the United States Marshals Service." 28 U.S.C. § 566(a). Under this section, U.S. Marshals "provide for the security and . . . obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court

of International Trade, and the United States Tax Court, as provided by law." *Id*. As class members emphasize, this list does not include the Superior Court. Second, class members seize on the word "Federal" in section 566(e)(1), which authorizes the United States Marshals Service "to provide for the personal protection of Federal jurists, court officers, witnesses, and other threatened persons." 28 U.S.C. § 566(e)(1). Class members argue that inclusion of the word "Federal" makes the entire subsection inapplicable to the Superior Court because, according to them, the Superior Court is equivalent to a state court. From these two provisions, class members conclude, "[T]he Act addresses the USMS's role regarding the federal courts (as opposed to addressing at all the *local D.C. Courts*)." Appellants' Br. 48.

Class members' reliance on these provisions is misplaced. For one thing, section 566(a) lays out the "primary"—not "exclusive"—"role and mission of the United States Marshals Service." Nothing in section 566(a) suggests that Congress intended to deprive the Superior Court Marshal of all federal authority within the court Congress designated that Marshal to serve. Moreover, given the dual federal/state status of Superior Court judges, Congress would have had to have used more specific language than "Federal jurist" to exclude them from section 566(e)(1)'s authorizations, especially given Congress's decision to create the office of Superior Court Marshal. *See United States v. Stewart*, 104 F.3d 1377, 1391 (D.C. Cir. 1997) (noting that D.C. Superior Court judges are "Article I . . . judges, whom Congress intended to be analogous to state court judges" and holding that a federal statute "authorized [them] to act as federal committing magistrates"). In any event, the statutory scheme gives the District no power to exercise authority over or delegate authority to the Superior Court Marshal. Instead, the statute clearly says that the Superior Court Marshal serves at the

"direction" of the United States Marshals Service. *See* 28 U.S.C. § 561(c). Thus, any authority Dillard exercised as Superior Court Marshal, whether delegated by the United States Marshals Service or provided directly by statute, was federal in nature.

Because Dillard, as Superior Court Marshal, was at all times a federal official acting under color of federal law, the organic theory provides no basis for finding the District liable under section 1983.

Entrustment Theory

Under this theory, the District exhibited deliberate indifference to Dillard's unconstitutional conduct by continuing to send pre-presentment arrestees to the Superior Court cellblock despite knowing they would be strip searched there. Holding a municipality liable for its deliberate indifference requires more than "a showing of simple or even heightened negligence." *Board of County Commissioners v. Brown*, 520 U.S. 397, 407 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (requiring that plaintiffs show that the municipality's policy was "so likely to result in the violation of constitutional rights," and the need to change that policy "so obvious," that policymakers "can reasonably be said to have been deliberately indifferent to the need"). To prevail on this theory, class members would have to show at least that the District had actual or constructive notice of unconstitutional strip search practices, as well as discretion to stop sending pre-presentment arrestees to the Superior Court Marshal. *See Warren v. District of Columbia*, 353 F.3d 36, 36–39 (D.C. Cir. 2004) ("[F]aced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction.").

We agree with the district court that even assuming that the District had notice of the strip search practices and that those practices were unconstitutional, the District lacked the discretion necessary for class members to prevail. Given that Dillard was at all times acting under color of federal law, *see supra* 6–9, the District had no authority to prevent him from conducting strip searches of arrestees upon their arrival at the Superior Court. Relying on two circuit court decisions, one by this Court and one by the Sixth Circuit, *see Warren*, 353 F.3d 36; *Deaton v. Montgomery County*, 989 F.2d 885 (6th Cir. 1993), for the proposition that "[i]t does not matter if the transferor has no control over the facility in which it places its prisoners," Appellants' Br. 34, class members believe they can prevail even if Dillard was at all times a federal official acting under color of federal law. In each of the cited cases, however, the municipality had contracted to send its prisoners to a penal facility; even though the municipality exercised no direct control over policies and practices at the facility, it retained power to cancel the contract in the event of constitutional violations. *See Warren*, 353 F.3d at 37; *Deaton*, 989 F.2d at 885. Here, by contrast, nothing in the record suggests that the District could have held presentment hearings somewhere other than the Superior Court. And although class members insist that the District had statutory authority to bypass the Superior Court Marshal and deliver pre-presentment arrestees directly to Superior Court judges, the statutory provisions class members rely on are ambiguous at best. Thus, the District's failure to embrace class members' statutory interpretation hardly demonstrates "deliberate indifference to the rights" of arrestees. *See Canton*, 489 U.S. at 388. Class members also claim that the District would lack authority to issue citations or release arrestees on bond if it had to deliver all arrestees to the Superior Court Marshal. But the Marshal exercises federal authority over persons actually *delivered* to the Superior Court for presentment, not over

everyone the Metropolitan Police Department detains. And while the District might issue citations for minor offenses such as traffic violations, arrestees have a right to a presentment hearing. *See* D.C. SUPERIOR CT. R. CRIM. P. 5(a); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991) ("[W]arrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975))).

Because neither the organic nor the entrustment theory transforms the Superior Court Marshal into a District policymaker for purposes of section 1983, the District cannot be held liable for Dillard's conduct. We thus turn to the question of Dillard's liability.

## III.

Relying on *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), Fourth and Fifth Amendment Class members bring constitutional tort claims against Dillard in his personal capacity. In response, Dillard argues that he is entitled to qualified immunity. While carrying out their official duties, federal officials enjoy qualified immunity from damages suits in order to "shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). To overcome a claim of qualified immunity, plaintiffs must show both that an official "violated a constitutional right" and that "the right was clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). The Supreme Court has made clear that courts may address the two stages of the qualified immunity analysis in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). Grateful for that flexibility, we address the claims of the two classes in turn.

The Fourth Amendment Class

Fourth Amendment Class members urge us to find that "the Fourth Amendment prohibits blanket strip searches of [detainees] arrested on minor charges," at least where no detainees were held in the general population and "there [is] no significant contraband problem." Appellants' Br. 17, 26–28. Like the district court, however, we have no need to reach the merits of this contested constitutional question in order to find Dillard entitled to qualified immunity. Under our decision in *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011), any Fourth Amendment right Dillard might have violated was insufficiently clearly established at the time. *See Pearson*, 555 U.S. at 237 (approving of addressing only the second stage of the qualified immunity analysis where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

In *Bame*, this Court, addressing only the "clearly established" stage of the qualified immunity analysis, found Dillard entitled to qualified immunity for Fourth Amendment claims brought by male plaintiffs—claims otherwise virtually indistinguishable from those brought by Fourth Amendment Class members in this case. Like class members, *Bame* plaintiffs were arrested for non-drug, non-violent offenses, held temporarily at "various police holding facilities," brought to the Superior Court "to await disposition of the charges against them," "strip searched upon arrival" at the Superior Court cellblock, placed together in holding cells, and released directly from the Superior Court cellblock without spending any time in

general jail populations. *Bame*, 637 F.3d at 382–83. The strip searches at issue in *Bame* occurred in September 2002, near the end of the Fourth Amendment Class period. *Id.* at 383.

According to *Bame* plaintiffs, by the time Dillard had implemented the challenged policies, the circuits had reached a "consensus" that policies similar to Dillard's violated the Fourth Amendment. *See Bame*, 637 F.3d at 385. But in *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court rejected a Fourth Amendment challenge to a penal strip search policy and instructed courts evaluating such challenges to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. In *Bame*, we held that Dillard, balancing these factors, could reasonably have concluded that his strip search policy was constitutional. *Bame*, 637 F.3d at 386 ("Clearly, it was reasonable for Dillard, like the courts of appeal that reached the issue after 2002, to believe strip searching all male arrestees was consistent with the law as set forth in *Bell* [and United States Marshals Service policy statements]."). Although *Bame* plaintiffs, like class members here, emphasized that they were charged with minor non-drug, non-violent offenses, we noted that "[t]he policy that the Court categorically upheld in *Bell* applied to all inmates, including those charged with lesser offenses and even those charged with no wrongdoing at all who were being held as witnesses in protective custody." *Id.* at 387 (internal quotation marks omitted). Although *Bame* plaintiffs, like class members here, emphasized the short duration of their stay at the Superior Court cellblock, we responded that "[c]ontrary to the plaintiffs' contention, nothing whatsoever in *Bell* suggests its holding is limited to overnight detention facilities." *Id*. Although *Bame* plaintiffs, like class members here, insisted that they never came into contact with detainees housed in general jail populations, we emphasized that

"*Bell* [nowhere] mention[ed], let alone rel[ied] upon, [intermingling with other detainees] as a reason for upholding the strip searches. In any event, arrestees held at the Superior Court were in fact commingled with other arrestees in holding cells; no one suggests each arrestee was put in a separate cell." *Id*. And finally, although *Bame* plaintiffs, like class members here, challenged the sufficiency of Dillard's contraband justification, we concluded that "the record here substantiates Dillard's point that the Superior Court had a persistent problem with contraband being smuggled into the cellblock, the very reason for strip searches." *Id*.

Fourth Amendment Class members attempt to distinguish *Bame* in three ways. First, they point to a consent agreement—the so-called *Morgan Order*—in which the District promised "not [to] conduct strip or squat searches of female police cases housed at the District of Columbia Detention Facility in the absence of a reasonable suspicion." *See Morgan v. Barry*, 596 F. Supp. 897, 898 (D.D.C. 1984) (explaining the agreement) (internal quotation marks omitted). According to class members, this agreement, which protects only female arrestees and thus was not at issue in *Bame*, put Dillard on notice that strip searching class members would violate their Fourth Amendment rights. In the *Morgan Order*, however, the District never concedes that any particular strip search policies violate the Fourth Amendment. Moreover, the *Morgan Order* binds only the District and its agents at the District of Columbia Detention Facility, not Dillard, a federal official in charge of the Superior Court cellblock.

Second, Fourth Amendment Class members claim that in *Bame* we addressed the constitutionality of strip searches without "individualized, reasonable suspicion" whereas they focus on "the right of arrestees, not entering general population,

to be free from strip searches prior to presentment to the court." Appellants' Br. 70. Contrary to class members' assertion, however, in *Bame* we expressly rejected the notion that *Bell* limited penal strip searches to overnight, general population facilities. *See Bame*, 637 F.3d at 387.

Third, Fourth Amendment Class members argue that "any contraband problem that may have existed in the Superior Court cellblock had evaporated by 1999 or 2000," Appellants' Br. 29, and that the Superior Court Marshal's failure to strip search all men belies the asserted effectiveness of strip searches. But in *Bame* we evaluated similar evidence of contraband and found that the Superior Court suffered from a "persistent problem with contraband" as late as 2002. 637 F.3d at 387. In any event, as the Supreme Court observed in *Bell*, a dearth of recovered contraband "may be more a testament to the effectiveness of this search technique as a deterrent." *Bell*, 441 U.S. at 559. And even if deputy marshals did not strip search all men, that hardly compels the conclusion that Dillard understood strip searches to be generally ineffective.

Thus, like the district court, we see no daylight between the claims we rejected in *Bame* and the ones Fourth Amendment Class members press here. *See Johnson*, 780 F. Supp. 2d at 74–75 ("[T]he claims addressed in *Bame* and the instant case cannot be distinguished in any meaningful way."). Although class members obviously disagree with *Bame*, that decision is binding on us. As a result, Dillard is entitled to qualified immunity because the Fourth Amendment right he is accused of violating was not clearly established at the time of any violation.

The Fifth Amendment Class

Fifth Amendment Class members maintain that the strip search gender disparity violated the Fifth Amendment's equal

protection guarantee. We resolve these claims, unlike the claims of the Fourth Amendment class, at the first stage of the qualified immunity analysis by examining whether Dillard violated class members' Fifth Amendment rights.

The parties agree that *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), controls this issue. In *Iqbal*, the Supreme Court addressed "[t]he factors necessary to establish a *Bivens* violation . . . [w]here the claim is invidious discrimination in contravention of the . . . Fifth Amendment[]." *Id.* at 676. Because "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences,'" *id.* (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)), supervisors face no liability for mere "knowledge and acquiescence in their subordinates' use of discriminatory criteria," *id.* at 677 (internal quotation marks omitted). Instead, under *Iqbal*, plaintiffs must show that supervisors acted with discriminatory purpose. *Id.* ("[P]urpose rather than knowledge is required . . . ."). "[T]he plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010).

Acknowledging that they "must prove Dillard intended to discriminate against women arrestees," Fifth Amendment Class members argue that Dillard "intended a policy, formal or informal, of women-only strip searches." Appellants' Br. 52. For his part, Dillard insists that his policy throughout the class period required "every prisoner"—both male and female—to go through the strip search process upon arrival at the Superior Court cellblock. *See, e.g.*, Dillard *Bame* Deposition 89:6–98:3. Although class members point to some evidence from which we might infer that Dillard knew deputies were implementing his

gender neutral policy in a gender imbalanced manner, plenty of other evidence suggests that Dillard was largely missing in action throughout the class period. But even assuming class members could show that Dillard knew what was going on at the cellblock, they have pointed to no evidence from which we could infer that Dillard himself intended to treat women differently from men. For instance, class members cite a former deputy marshal's testimony that the practice in the cellblock was to strip search all female detainees but not all males because of certain "differences in the anatomy." Shealey Deposition 158:8–162:22. But that same former deputy went on to testify that any disparate treatment did not reflect Dillard's policy: "[Supervisors] put [no] emphasis on females. They basically [made] sure that everybody was thoroughly searched coming into that cell block, and that we had policies and procedures in place to conduct those searches to make sure that no contraband came into those cell blocks." Shealey Deposition 164:7–13. This is hardly an isolated example. Indeed, class members cite no testimony by any subordinate indicating that the gender disparity resulted from Dillard's instruction or intention.

Class members also claim that the United States Marshals Service admitted in interrogatory responses in two other cases that despite Dillard's assertions "the 'more customized' policy was to stop strip searching males and to continue strip searching females." Appellants' Br. 60. But these responses, both written by the same deputy marshal who testified that supervisors "put [no] emphasis on females," describe the "practice" among deputies at the cellblock, not Dillard's policies. *Helton* Interrogatory Response 4; *Clifton* Interrogatory Response 5.

In a final effort to demonstrate discriminatory purpose, class members ask us to grant them an adverse inference from missing evidence. Specifically, they claim that although Dillard prepared

a written policy statement during the class period laying out Superior Court operating procedures, he failed to produce a copy during discovery. "Because defendant never acknowledged or produced Dillard's written search policy," class members assert, "plaintiffs are entitled to an adverse inference that the policy was to strip search all female prisoners but not males." Appellants' Br. 58. Dillard, however, has not only consistently denied the existence of any undisclosed policy statement but has also maintained that he left behind all official documents at the end of his term as Superior Court Marshal because "they were government property." Dillard Br. 65. Even assuming an undisclosed policy statement once existed, an adverse inference from missing evidence is appropriate only "if it is peculiarly within the power of one party to produce the evidence . . . . The party complaining of the missing evidence bears the burden of demonstrating that it is peculiarly in the opposing party's control." *Czekalski v. LaHood*, 589 F.3d 449, 455 (D.C. Cir. 2009) (internal quotation marks omitted). Since class members nowhere dispute Dillard's explanation for why he left behind all official documents, they have failed to show that the policy statement was ever "peculiarly within [Dillard's] power . . . to produce" or "peculiarly in [Dillard's] control." *Id.*

We thus agree with the district court that "there is no circumstantial or direct evidence that Marshal Dillard purposefully directed that women and men be searched differently at the Superior Court cellblock." *Johnson*, 780 F. Supp. 2d at 81. Under *Iqbal*, then, Dillard is entitled to qualified immunity because class members have failed to show that he violated their Fifth Amendment rights.

**IV.**

For the foregoing reasons, we affirm.

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part and concurring in the judgment. I write principally because this court, as in ten other circuits, should "clearly establish[]," *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982), that indiscriminate strip searching of individuals awaiting presentment on non-violent, non-drug offenses who are not held in the general population is unconstitutional under the Fourth Amendment to the United States Constitution in the absence of reasonable suspicion an individual possesses contraband or weapons. *See Bame v. Dillard*, 637 F.3d 380, 388 (D.C. Cir. 2011) (Rogers, J., dissenting).

## I.

In the absence of *en banc* review, *Bame*, 637 F.3d 380, is the law of the circuit, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*). In *Bame*, the court applied the doctrine of constitutional avoidance and did not decide whether a Fourth Amendment violation occurred. *See Bame*, 637 F.3d at 384 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)); *cf.* Op. at 12. Since *Bame* was decided the Supreme Court in *Camreta v. Greene*, —— U.S. ——, 131 S. Ct. 2020 (2011), has underscored the undesirability of the "flexibility," Op. at 12, afforded to courts under *Pearson v. Callahan* to avoid deciding whether a constitutional violation has occurred where the defendant is entitled to qualified immunity. Not deciding the constitutional question "threatens to leave standards of official conduct permanently in limbo." *Camreta*, 131 S. Ct. at 2031. By proceeding directly to the immunity question, not only do "[c]ourts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements," *id.*, but the failure to decide constitutional questions "may frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior," *id.* (quoting *Pearson*, 555 U.S. at 237).

Also since *Bame*, six Justices of the Supreme Court have expressed unease with the type of indiscriminate strip searching engaged in by the Superior Court Marshal's Office that is challenged here and was challenged in *Bame*. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, ⎯⎯ U.S. ⎯⎯, 132 S. Ct. 1510, 1523 (2012) (Roberts, CJ., concurring); *id.* at 1524 (Alito, J., concurring); *id.* at 1525 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting). The Supreme Court's expression of unease is not new, appearing even in the context of post-arraignment defendants held in the general prison population. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979) ("[T]his practice instinctively gives us the most pause.").

Nearly every other circuit court of appeals (and the District of Columbia's highest court, *see United States v. Scott*, 987 A.2d 1180, 1196–97 (D.C. 2010)) has understood that the humiliating and essentially non-productive practice of strip searching pre-arraignment arrestees not held in the general population is an unreasonable search under the Fourth Amendment in the absence of reasonable suspicion. *See Bame*, 637 F.3d at 391–92, 395 (Rogers, J., dissenting) (citing cases from the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals); *see Powell v. Barrett*, 541 F.3d 1298, 1300–02 (11th Cir. 2008) (*en banc*); *Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 980–81 (9th Cir. 2010) *(en banc)*. The Third Circuit has yet to address the issue, rejecting only a Fourth Amendment challenge to blanket strip searches upon arrestees admission to the general jail population. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 298–99, 311 (3d Cir. 2010). Evidence before the courts and in the instant case confirms that modern technology and law enforcement experience have shown that indiscriminate strip searching of non-violent, non-drug pre-arraignment arrestees after the use of metal detectors and patdowns to locate contraband rarely yields additional security benefits. *See, e.g.,*

*Roberts v. State of R.I.*, 239 F.3d 107, 112 (1st Cir. 2001); *see id.* (citing *cf. Mary Beth G. v. City of Chicago*, 723 F.3d 1263, 1272–73 (7th Cir. 1983)); Appellants' Ex. 410 (compiling incident reports).  Contrary court findings involve the prison environment where smuggling of contraband "is all too common an occurrence" and deference is due to the policy judgments of prison administrators.  *Bell v. Wolfish*, 441 U.S. at 559; *see also Florence*, 621 F.3d at 310.

Members of the Fourth Amendment class here were not being held in the general population with post-arraignment arrestees and strip searches in their circumstances illustrate one aspect of the Justices' unease in *Florence*, 132 S. Ct. at 1523, 1524, 1525.  Applying the canon of constitutional avoidance in this circuit is unwarranted, particularly in view of the recurring court challenges to indiscriminate strip searching by the U.S. Marshals Service in the Nation's Capital, the frequent situs of demonstrations as in *Bame*. *See Helton v. United States*, 191 F. Supp. 2d 179 (D.D.C. 2002); *Clifton v. United States*, No. 02-0578 (D.D.C. Mar. 26, 2002); *see also Morgan v. Dist. of Columbia*, No. 81-1419 (D.D.C. July 22, 1981), applied in *Morgan v. Barry*, 596 F. Supp. 897, 898–99 (D.D.C. 1984).  The United States advises that the U.S. Marshals Service has abandoned the challenged strip searching policy and practice. *See* Appellee Dillard Br. 59 n.17; Op. at 2.  This does not ensure that the practice will not be revived, much less provide guidance for new policies and practices, promote law-abiding behavior, or justify the court in not "clearly establish[ing]" that the Fourth Amendment rights of the appellant class were violated by the Superior Court Marshal.  Joining the ten other circuit courts of appeals, I would hold that the indiscriminate strip searching of the Fourth Amendment class in the absence of reasonable suspicion violated the Fourth Amendment.

4

**II.**

Otherwise, I generally agree that appellants' claims fail.

**A.** The Superior Court Marshal is a federal official who was acting under color of federal law, and the District of Columbia cannot be held liable for the challenged actions of Marshal Dillard. Op. at 9.

Somewhat less persuasive is the District of Columbia's suggestion that it "had no choice," Appellee D.C. Br. 41, not to turn over to the Superior Court Marshal for presentment individuals arrested by the Metropolitan Police Department, regardless of whether the Marshal's strip searching practices violated the Fourth Amendment rights of non-violent, non-drug pre-arraignment arrestees. The District of Columbia can sue as well as be sued, *see* D.C. Code § 1-102, and can seek the aid of the courts to protect individuals in its custody. Appellants point to the District of Columbia's obligation to ensure the enforcement of the order in *Morgan v. Barry*, 596 F. Supp. 897, 898 (D.D.C. 1984), that barred its own officers from strip searching female arrestees housed at the District of Columbia Detention Facility in the absence of a "reasonable suspicion that a weapon, contraband or evidence of a crime are concealed on the person or in the clothing of the arrestee which the District [of Columbia] or its agents reasonably believe can only be discovered by a strip or squat search." *Cf. Washington v. United States*, 594 A.2d 1050, 1052 (D.C. 1991) (quoting MPD Gen. Order 502.1, Processing Prisoners 3, § B(5) barring body cavity searches of arrestees by police officers). The District of Columbia did not seek such aid on behalf of the Fourth Amendment class, but at the time there was neither an outstanding order with respect to the Superior Court Marshal, nor a decision by this court (or the D.C. Court of Appeals), "clearly establish[ing]" that blanket strip searching of pre-

arraignment arrestees like the Fourth Amendment class is unreasonable and a violation of the Fourth Amendment.

**B.** With regard to the constitutional challenges, because *Bame*, 637 F.3d at 386, is the law of the circuit Marshal Dillard is entitled to qualified immunity on the Fourth Amendment claims. Op. at 12. Given appellants' agreement that *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is controlling at the summary judgment stage of the proceedings, Op. at 16, the Fifth Amendment claims fail for lack of evidence of a constitutional violation. Op. at 18.

In that regard, the court observes that Marshal Dillard was "largely missing in action throughout the class period." Op. at 16. Although Dillard agreed that there was no reason to treat male and female arrestees differently, *see* Dillard Dep. 77:1–7, on his watch his deputies indiscriminately strip searched only women. Op. at 3. Summary judgment presents no occasion for the court to weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reasonable jury could find that knowing acquiescence to continuing violations of a plaintiff's Equal Protection rights by one's deputies amounts to purposeful conduct and infer, in the absence of a legitimate non-invidious reason for treating women differently than men, a defendant's discriminatory purpose. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977); *cf. also Primas v. Dist. of Columbia*, 719 F.3d 693, 697–98 (D.C. Cir. 2013); *Evans v. Sebelius*, 716 F.3d 617, 620–22 (D.C. Cir. 2013). Dillard repeatedly swore, however, that he believed men and women were being strip searched in the same manner, *see* Dillard Dep. 96:10–97:8, 99:8–101:12, and the Fifth Amendment class fails to proffer evidence from which a reasonable jury could find that he had a women-only strip search policy or knew of the disparate treatment by his deputies. Op. at 16–18. Absent evidence that Dillard either had

a blanket policy for strip searching only female arrestees, or knew that his deputies were doing so indiscriminately and did nothing to stop them, a discriminatory purpose by Dillard cannot reasonably be inferred.