# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 16, 2015     Decided June 14, 2016

No. 14-5074

SUSAN M. MORRIS,
APPELLANT

v.

GINA MCCARTHY, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00701)

———

*Ellen K. Renaud* argued the cause for appellant. With her
on the briefs were *David H. Shapiro* and *Richard L. Swick*.

*Brian P. Hudak*, Assistant U.S. Attorney, argued the
cause for appellee. With him on the brief were *Ronald C.
Machen*, *Jr*., U.S. Attorney at the time the brief was filed, and
*R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GRIFFITH and MILLETT, *Circuit Judges*, and
WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This case stems from two adverse employment actions taken against appellant Susan Morris while she worked for the Environmental Protection Agency (EPA): a seven-day suspension without pay in 2008 and a termination in 2010. Morris claims that both actions violated Title VII. The district court granted summary judgment against Morris's suspension claims and dismissed her termination claims. We reverse in part the grant of summary judgment, concluding that a reasonable jury could find that Morris's suspension was motivated by racial discrimination. We affirm the dismissal of her termination claims because she failed to exhaust her administrative remedies.

I

A

Morris, a white woman, worked as a manager in EPA's Office of Civil Rights (OCR) for ten years, most recently as Assistant Director for Affirmative Employment. Her supervisor was Director Karen Higginbotham, who in turn reported to Ray Spears, EPA's Deputy Chief of Staff. Both Higginbotham and Spears are African-American.

Morris received several awards for leadership and service during her time at EPA, but her career path at the agency hit a snag in 2007 when she disagreed with EPA employee Nancy Tommelleo over the naming of an agency advisory group that was asked to look into the concerns of gay and lesbian employees. Because we are, in part, reviewing a grant of summary judgment to EPA, we recount the facts of this conflict over the group's name in the light most favorable to Morris.

Tommelleo and Morris discussed the naming issue in a conference call with Higginbotham in August 2007. Afterward, Tommelleo sent a memo to her supervisor and other EPA officials complaining that Morris had behaved unprofessionally during the call. On September 21, 2007, Tommelleo's supervisor forwarded this memo to Higginbotham, Spears, and other officials, along with her own memo objecting to Morris's conduct.

Higginbotham was "surprised" to receive Tommelleo's memo, as she had found Morris "forceful" but not disrespectful during the call. Higginbotham Decl. ¶ 8. Higginbotham told Morris about the memo shortly after receiving it, but despite Morris's requests, did not provide her with a copy until December 21, 2007. Higginbotham told Morris, "Do not respond to this memo. I will prepare the response and you will be copied on my reply." J.A. 358 (emphasis in original).

When Higginbotham had not responded to the memo by February 2008, Morris emailed a document that she called an "issue sheet" to Higginbotham, Spears, and the members of the agency's Human Resources Council. According to Morris, EPA encourages employees to submit issue sheets to air personnel grievances. Morris's issue sheet complained that EPA employees outside OCR were exercising undue sway over the agency's equal employment policies and that Morris's reputation had been attacked in a number of ways— including by Tommelleo's memo and the accompanying memo written by Tommelleo's supervisor, by Higginbotham's failure to respond as promised, and by Higginbotham's refusal to allow Morris to reply. The issue sheet also quoted passages from the memos penned by Tommelleo and her supervisor.

Higginbotham immediately emailed Morris to say that she believed the issue sheet directly violated her order not to respond to Tommelleo's memo, and that she would consider disciplinary action as a result. In reply, Morris defended herself by arguing that she had not responded to the memo and thus Higginbotham had no basis for disciplinary action. A month later, Higginbotham proposed to Spears that Morris be suspended without pay for seven days. Spears approved the suspension on April 28, 2008.

Morris's difficulties at the agency continued after the suspension. Two years later, in March 2010, Higginbotham proposed terminating Morris's employment for reasons including insubordination and misuse of supervisory authority. The day after Morris learned of the proposed termination, she filed a whistleblower complaint with the Office of Special Counsel (OSC)—an independent prosecutorial agency that investigates federal employees' claims of prohibited personnel practices—alleging that EPA proposed terminating her because she had exposed wrongdoing within the agency. The complaint's precise content is not pertinent here, but its impact on Morris's termination is: at the OSC's request, EPA agreed to delay firing Morris pending the investigation of her whistleblower complaint. But in August 2010, EPA declined to delay further and Spears terminated Morris's employment.

B

Morris filed suit in district court on April 8, 2011, alleging that both her suspension and termination violated Title VII. As relevant here, she claimed that the agency took these actions against her because of her race and because she complained of discrimination. *See* 42 U.S.C. § 2000e *et seq.*

Title VII plaintiffs must exhaust their administrative remedies before bringing their claims to court. *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). But the actions a federal employee must take to satisfy the exhaustion requirement differ based on a number of factors, including the severity of the adverse employment action at issue. *See* BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 32-35 (5th ed. 2012). For a suspension of fourteen days or fewer, like Morris's, a federal employee must first consult an equal employment opportunity (EEO) counselor at her agency to "try to informally resolve the matter." 29 C.F.R. § 1614.105(a). After informal counseling, an employee whose concerns are not resolved may file a formal complaint with her agency's EEO office. 29 C.F.R. § 1614.106(a), (b). Finally, if that office finds against her, she may appeal further to the Equal Employment Opportunity Commission (EEOC) or file suit in district court. 42 U.S.C. § 2000e-16(c); *see Howard v. Pritzker*, 775 F.3d 430, 438-39 (D.C. Cir. 2015).

This process varied slightly for Morris. Because her complaint implicated personnel in her agency's civil rights office, agency procedures enabled her to consult an independent EEO counselor from the Department of Energy and to file a formal complaint with that agency. The district court found that Morris timely took these steps. It held that she exhausted her administrative remedies with respect to her claim that her suspension violated Title VII.

Morris's claim that her termination violated Title VII involved a more serious personnel action and therefore triggered different options for exhausting her administrative remedies. *See Hamilton v. Geithner*, 666 F.3d 1344, 1349-50 (D.C. Cir. 2012). One option for an employee who alleges

that she was fired because of discrimination or retaliation is to pursue a complaint with her agency's EEO office. *See id.*; 5 C.F.R. § 1201.154(a); 29 C.F.R. § 1614.302(b). If she does not prevail there, she may either file a discrimination suit in federal district court or appeal to the Merit Systems Protection Board (MSPB), an agency that adjudicates federal employment disputes. *See* 5 C.F.R. § 1201.154(b); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(a). Another option is to sidestep the agency's EEO office entirely and file an appeal directly with the MSPB. *See* 5 C.F.R. § 1201.154(a); 29 C.F.R. § 1614.302(b). Morris chose the latter route: she appealed her termination to the MSPB on September 8, 2010.

At the MSPB, an administrative judge takes evidence and issues a decision. That decision becomes final after 35 days if the parties do not seek review by the full Board. *See* 5 C.F.R. § 1201.113. The employee may then challenge the agency's decision by filing suit in district court within 30 days of receiving notice of the MSPB's "judicially reviewable action." 5 U.S.C. § 7703(b)(2). She may also bring suit in district court if the MSPB takes no "judicially reviewable action" within 120 days of the date she files her appeal. *Id.* § 7702(e)(1)(B).

Morris's course before the MSPB took a number of twists. First, at the OSC's request, the MSPB ordered that Morris be reinstated at EPA while the OSC investigated her whistleblower complaint, until January 21, 2011. Then, in October 2010, the MSPB administrative judge asked the parties to weigh in on whether, in the interest of judicial economy, Morris's MSPB appeal should be dismissed without prejudice while the OSC investigation proceeded. EPA favored dismissal. Morris requested that the administrative judge hold the MSPB proceedings in abeyance until the

completion of the OSC investigation. Should the judge dismiss the case, however, Morris asked her to provide "assurances" that Morris had not "waiv[ed] any right to seek relief in the event that the matter [was] not resolved at the conclusion of OSC's investigation." Mot. to Stay Proceedings Pending Outcome of Investigation by the Office of Special Counsel at 2-3, *Morris v. EPA*, No. DC-0752-10-0865-I-1 (M.S.P.B. Oct. 18, 2010).

The administrative judge dismissed Morris's MSPB appeal without prejudice on October 20, 2010, explaining that regulations permit the MSPB to hold cases in abeyance only to facilitate settlement or discovery. However, the judge ordered that Morris's appeal be automatically refiled upon the expiration of her temporary reinstatement at EPA. This automatic refiling was intended to provide the "assur[ance]" Morris requested: that her right to seek relief before the MSPB would not be prejudiced by the dismissal, which was entered, not as a determination of the merits of her appeal, but simply because the OSC investigation might provide the relief Morris sought. *Morris v. EPA*, No. DC-0752-10-0865-I-1, at 3 (M.S.P.B. Oct. 20, 2010). Pursuant to the administrative judge's order, Morris's MSPB appeal was automatically refiled on January 24, 2011, after Morris's reinstatement at EPA expired. But in April 2011, three days before her scheduled MSPB hearing, Morris withdrew her MSPB appeal and filed suit in district court.

The district court dismissed Morris's claim that her termination violated Title VII, holding that she failed to exhaust her administrative remedies because she did not allow the MSPB sufficient time to adjudicate her appeal. And although Morris's claims regarding her suspension survived dismissal, the district court ultimately disposed of them at

summary judgment. According to the district court, no reasonable jury could find that Morris's suspension was motivated by discrimination because she had not shown that EPA's proffered explanation for suspending her was mere pretext for racial animus. The court also rejected Morris's claim that her suspension was retaliatory, reasoning that she had not shown that Spears, the final decisionmaker, knew she had engaged in any activity protected by Title VII.

Morris appeals both the dismissal of her termination-based claims and the grant of summary judgment on her suspension-based claims. We have jurisdiction under 28 U.S.C. § 1291.

II

Morris first argues that the district court erred in dismissing her termination-based claims. We review de novo a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schlottman v. Perez*, 739 F.3d 21, 25 (D.C. Cir. 2014). Like the district court, we hold that Morris failed to exhaust her administrative remedies.

Morris filed suit in district court on April 8, 2011—74 days after her appeal was automatically refiled with the MSPB on January 24, 2011. The district court reasoned that Morris failed to exhaust her administrative remedies because she did not give the MSPB 120 days from the January refiling date to adjudicate her claims, as required by statute. *See* 5 U.S.C. § 7702(e)(1)(B). Before us, Morris contends that she allowed the agency sufficient time because she *first* filed her appeal with the MSPB in September 2010. The MSPB's October 2010 dismissal without prejudice was not, she argues, a "judicially reviewable action." She urges that because the MSPB took no judicially reviewable action within 120 days

of her September 2010 filing date, she was entitled to sue in district court under section 7702(e)(1)(B). EPA responds that the MSPB took a judicially reviewable action when the administrative judge dismissed Morris's appeal without prejudice in October 2010. If Morris wanted to challenge this dismissal, the agency contends, she should have done so within 30 days of the date the MSPB decision became final— by December 24, 2010.

Regardless of whether the October 2010 dismissal was judicially reviewable, we conclude that Morris has failed to exhaust her administrative remedies. Morris invited the MSPB to delay the processing of her appeal when she asked the administrative judge to suspend the proceedings. Having requested this postponement, Morris cannot now argue that the agency failed to promptly adjudicate her claim. *Cf. Bhd. of R.R. Trainmen v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 380 F.2d 605, 609 (D.C. Cir. 1967) ("A party may not allege on appeal as error an action which he had induced [an administrative] tribunal to take[.]"). Indeed, finding the exhaustion requirement of section 7702(e)(1)(B) satisfied here would create a problematic loophole. Future litigants wishing to avoid agency adjudication could request a delay before the MSPB, wait 120 days, and then file in district court without ever advancing their claims in the administrative forum. *See Vinieratos v. U.S. Dep't of Air Force*, 939 F.2d 762, 774 n.11 (9th Cir. 1991) (explaining that the 120-day rule "is not an escape valve" allowing a claimant to postpone his MSPB appeal to pursue remedies in another administrative forum and "nonetheless obtain a hearing in federal court").

When litigants bypass administrative resolution in this manner, the substantial benefits of exhaustion are lost. As the Supreme Court has explained, exhaustion serves two main

purposes: it "protects administrative agency authority" by allowing the agency to correct its own mistakes and by discouraging disregard of its procedures, and it "promotes efficiency" by building a useful record for judicial review and, in some cases, eliminating the need for judicial review altogether. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks omitted). We decline to read the 120-day timer of section 7702(e)(1)(B) in a manner that would undermine these goals.

Morris argues that she should be permitted to pursue her claims in district court despite her request to postpone adjudication before the MSPB. She contends that she did not initiate the October 2010 dismissal; rather, the MSPB did when it asked whether Morris's appeal should be dismissed without prejudice. *See* Oral Arg. at 9:30-9:55. Had Morris preferred not to delay the MSPB proceedings, however, her recourse was simple: she could have said so. Instead, she requested that the MSPB postpone her appeal. She further argues that because she requested a stay before the MSPB, and not a dismissal, she did not "abandon" her MSPB appeal. *See* Oral Arg. at 2:11-2:57. But our holding does not hinge on the precise nature of Morris's request. What matters is that Morris received the outcome she invited: a lag of more than four months between when she first filed and when her case proceeded before the MSPB. She cannot argue that the agency should have processed her appeal during this interval.

Morris therefore did not allow the agency the requisite 120 days to adjudicate her appeal. In reaching this conclusion, we need not decide whether the statute's 120-day timer began ticking when Morris first filed her appeal or when her appeal was automatically refiled. Counting from either date, her appeal was not actively pending before the MSPB for 120

days.[1] As a result, the district court properly dismissed her termination claims for failure to exhaust her administrative remedies.

III

Morris next challenges the district court's grant of summary judgment on her claims that her suspension was discriminatory and retaliatory in violation of Title VII. We review that decision de novo, *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014), viewing the evidence in the light most favorable to Morris, drawing all reasonable inferences in her favor, and avoiding weighing the evidence or making credibility determinations, *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012). We may affirm the district court's judgment only if no reasonable jury could reach a verdict in Morris's favor. *Id.*

Under Title VII, the federal government may not discriminate against employees on the basis of race, 42 U.S.C. § 2000e–16(a), or retaliate against them because they complain of discrimination, *id.* § 2000e–3(a). *See Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977). Morris claims that EPA did both to her.

We analyze Morris's claims using the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this formula, an employee must first make out

---

[1] From Morris's initial September 8, 2010, filing date, 42 days elapsed until the MSPB dismissed her appeal on October 20, 2010. Another 74 days passed between January 24, 2011, when the appeal was refiled, to April 8, 2011, when Morris filed in district court. Morris's appeal was actively pending before the MSPB, then, for no more than 116 days.

a prima facie case of retaliation or discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The employer must then come forward with a legitimate, non-discriminatory or non-retaliatory reason for the challenged action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the employer meets this burden, the *McDonnell Douglas* framework falls away and the factfinder must decide the ultimate question: whether the employee has proven intentional discrimination or retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-12 (1993). The employee can survive summary judgment by providing enough evidence for a reasonable jury to find that the employer's proffered explanation was a pretext for retaliation or discrimination. *Hamilton*, 666 F.3d at 1351; *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Evaluating whether an employee may proceed to trial, we ask whether a reasonable jury could infer discrimination or retaliation from "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [any] other evidence." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). A jury may infer discrimination from, among other things, "evidence of discriminatory statements or attitudes on the part of the employer." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc). To avoid summary judgment, employees need not necessarily provide evidence beyond that rebutting the employer's stated explanation. *See Reeves*, 530 U.S. at 147-48.

A

We start with Morris's claim that her suspension was motivated by racial discrimination. She argues that Higginbotham's alleged racial bias influenced Spears's decision to suspend her. In other words, Morris asserts that Spears was the conduit of Higginbotham's discriminatory motives—her "cat's [] paw." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). Under a cat's-paw theory of discrimination, an employer may be held liable for discriminatory acts by a direct supervisor—even where that supervisor is not the final decisionmaker—if "[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 & n.1 (D.C. Cir. 2015) (applying *Staub* in the Title VII context). Here, *Staub*'s second prong is easily met: Higginbotham's recommendation that Morris be suspended for insubordination was clearly intended to cause such a suspension. The first and third prongs of *Staub* warrant discussion, but we ultimately conclude that Morris has introduced sufficient evidence for a reasonable trier of fact to find in her favor.

i

Under the first prong, a reasonable jury could find that the insubordination charge was pretextual and that Higginbotham was motivated by discriminatory animus when she recommended suspending Morris. We base this conclusion on evidence that Higginbotham harbored bias

14

toward white employees, as well as on the weaknesses Morris identifies in EPA's explanation for the suspension.

Morris's strongest evidence of Higginbotham's discriminatory attitude consists of race-based remarks she allegedly made. An EPA employee supervised by Morris, Alease Wright, recalled that around 2005 or 2006, Higginbotham said of Morris, "[T]he little white woman better stand in line . . . . [T]his is EPA[;] we can whip her into shape." Wright Decl. ¶ 7. Wright also testified that "Higginbotham told me that John Newton, an African-American, could not get a promotion from a white woman, so she told Ray Spears to send him down to [Higginbotham's] office and she would give him a [promotion to pay-scale level] GS-15." *Id.* ¶ 6. Similarly, Morris attested that Higginbotham once said, "[I]f the white woman up there won't promote [Newton], I will." Morris Decl. ¶ 13. Morris further testified that on one occasion Higginbotham referred to a group of young men working at EPA as "nasty little white boys." *Id.* ¶ 21; *see also* Morris Dep. at 82. Another time, at a staff meeting discussing an unrelated incident in which EPA was found to have discriminated against an employee, Higginbotham told the staff that "those white boys . . . will learn a lesson now." Morris Dep. at 86.

In granting summary judgment to EPA, the district court discounted these statements one by one: the comment that Morris "better stand in line" was made too long before Morris's suspension to be probative; Wright's statement about Newton was belied by the record; and the remaining comments were "stray remarks" unrelated to Morris's suspension.

We disagree with the district court's treatment of these remarks. For starters, the determination that the record did not support Wright's statement about Newton improperly credits EPA's evidence over Morris's. The district court found that Newton was not promoted into his position at OCR and that his prior supervisor was not a white woman but an African-American man. As such, the district court discredited Wright's testimony. But this evidence merely creates a question of fact as to whether Higginbotham actually made the statement Wright attributed to her: that Newton "could not get a promotion from a white woman" and that Higginbotham would therefore promote him. It is the jury's role—not the court's—to determine the weight to give Wright's recollection in light of evidence casting doubt on its accuracy. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Moreover, in dismissing Higginbotham's comments about "nasty little white boys" and "white boys . . . learn[ing] a lesson" as immaterial "stray remarks"—that is, statements unrelated to Morris's suspension—the district court failed to view the record in the light most favorable to Morris. Although we have found that an isolated race-based remark unrelated to the relevant employment decision could not, without more, permit a jury to infer discrimination, *see, e.g.*, *Waterhouse v. District of Columbia*, 298 F.3d 989, 996-97 (D.C. Cir. 2002), we have not categorically labeled such comments immaterial. To the contrary, we have found these types of statements to support a verdict for a Title VII plaintiff. *See, e.g.*, *Evans v. Sebelius*, 716 F.3d 617, 622-23 (D.C. Cir. 2013); *Talavera v. Shah*, 638 F.3d 303, 312-13

(D.C. Cir. 2011); *Anderson v. Grp. Hospitalization, Inc.*, 820 F.2d 465, 472 (D.C. Cir. 1987); *see also Reeves*, 530 U.S. at 152-53 (cautioning lower courts against discounting discriminatory statements "not made in the direct context" of the challenged employment action). The same is true of remarks made significantly before the relevant employment action, such as Higginbotham's statement that "the little white woman better stand in line." Even if such a statement carries less weight than one made at the time of the suspension, it is nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks. Instead of reviewing each racially charged remark individually and finding it insufficient, we consider it alongside any additional statements—and all other evidence—to determine whether a plaintiff has met her burden. *See Aka*, 156 F.3d at 1290 (explaining that at summary judgment, "the court must consider all the evidence in its full context").

Here, Morris introduced evidence that Higginbotham made multiple racially biased statements about white employees—including one about Morris. EPA points to no case in which we have affirmed a grant of summary judgment to an employer despite racially charged statements of the number and tenor of those here, and we have found none.[2] These remarks are readily distinguishable—whether because of their pervasiveness, severity, or the role of the speaker in the adverse action—from those this court has said would not

---

[2] When asked at oral argument to identify such a case, counsel for EPA pointed to *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992). *See* Oral Arg. at 34:45-35:49. But the remarks in *Ezold* were attributed to a company executive who took no part in the ultimate employment decision at issue. *See* 983 F.2d at 543-47.

permit a jury to infer discrimination. *See, e.g.*, *Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012) (single statement by individual uninvolved in the challenged employment decision); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654-55 (D.C. Cir. 2003) (single email sent by individual uninvolved in the challenged employment decision); *Waterhouse*, 298 F.3d at 996-97 (general statement regarding diversity efforts made by supervisor years after the challenged employment action; statement that the office had "too many white managers" made by supervisor in the same year he hired plaintiff, a white manager); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999) (single statement made after the challenged employment decision by individual uninvolved in that decision). Considered together, Higginbotham's statements could lead a reasonable juror to find that she harbored a discriminatory attitude toward white employees.

Of course, Morris must show more than a general bias against white employees; she must also introduce enough evidence for a reasonable jury to find that her suspension was motivated by that bias. To make this showing, Morris relies on weaknesses in EPA's explanation. Specifically, she contends that a reasonable jury could find that her issue sheet was not a "response" to Tommelleo's memo, and could therefore infer that Higginbotham did not honestly believe Morris had violated the instruction not to respond. For its part, EPA argues that under Title VII, an employer need not be *correct* in its nondiscriminatory reason for disciplining an employee; it need only honestly believe the reason and therefore lack a discriminatory motive. Morris's subjective opinion that her issue sheet did not "respond" to the critical memo, EPA contends, is irrelevant.

EPA is correct that a Title VII plaintiff cannot survive summary judgment merely by asserting that her employer made a bad decision. Rather, she must raise a genuine dispute over the employer's honest belief in its proffered explanation. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992))). A plaintiff can meet this burden by casting doubt on the objective validity of the employer's explanation.[3] *See, e.g.*, *Reeves*, 530 U.S. at 143-46.

Morris does precisely that. She challenges the objective validity of EPA's insubordination explanation in an effort to call into question whether Higginbotham honestly believed that justification. She argues that a reasonable jury could find that she did not violate Higginbotham's order, but rather wrote a human resources complaint protesting (1) the involvement of EPA staff outside of OCR in the agency's equal employment policies and (2) Higginbotham's refusal to respond to the allegations in the memo. She asserts that she did not send the issue sheet to Tommelleo or Tommelleo's supervisor and did not answer their accusations at any length, although she "recount[ed]" some of their charges against her. Appellant's Br. at 30. Further, she adds that Higginbotham's

---

[3] The cases EPA cites do not dispute this point. Rather, they merely stand for the principle that a plaintiff cannot survive summary judgment unless there is a *genuine* dispute as to the employer's sincerity—that is, a dispute that would allow a reasonable jury to find for the plaintiff. *See Hairston*, 773 F.3d at 273; *Brady*, 520 F.3d at 496 & n.4.

reasons for failing to respond to the memo were feeble. Higginbotham said that other work priorities overwhelmed her during the fall of 2007 and that she was dealing with her own medical issues and those of her ailing brother. But Morris presents evidence that the medical issues were largely resolved by mid-September 2007, and that the additional work priorities wrapped up in November—before Higginbotham ever told Morris in December 2007 that she would reply to the memo.

Drawing all inferences in Morris's favor, then, the following sequence of events emerges: Higginbotham knew that Morris, a senior manager in her group, had been wrongly accused of unprofessional conduct. She forbade Morris from responding to those accusations, promising that she would do so herself. But she failed to reply for some two months after sending Tommelleo's memo to Morris (five months after receiving it in the first place) and offered unpersuasive explanations for that failure. Morris, forbidden from responding to the allegations herself and finding her supervisor unwilling to step in, ultimately submitted a human resources complaint protesting her supervisor's handling of the incident and broader office policies, taking care not to reply directly to the employees who had made the accusations. She was then charged with insubordination for violating the order not to "respond." Viewed from this perspective, a reasonable jury could be "quite suspicious" of the sincerity of Higginbotham's insubordination charge. *Evans*, 716 F.3d at 622. And combined with evidence that Higginbotham had made repeated, disparaging comments about white employees, including one statement about Morris, that jury could find that the insubordination charge was pretext for racial discrimination. *See id.*

Considering the evidence in the light most favorable to Morris, we cannot say as a matter of law that Higginbotham honestly believed the nondiscriminatory reason she provided. While a reasonable jury might infer from these facts that Higginbotham's justification was sincere, it might instead infer that in charging Morris with insubordination, Higginbotham was dissembling to cover up a discriminatory motive. Resolving such conflicting inferences is precisely the type of function we leave to the jury, not to a judge ruling on a summary judgment motion. *See Pardo-Kronemann v. Donovan*, 601 F.3d 599, 605 (D.C. Cir. 2010). Morris therefore survives summary judgment on the first *Staub* prong.

ii

*Staub*'s third prong requires that the biased supervisor's act be a proximate cause of the ultimate employment action. EPA argues, and the district court found, that Spears's independent investigation of the insubordination charge insulated his decision to suspend Morris from Higginbotham's racial bias. In effect, EPA contends that any animus on Higginbotham's part was not a proximate cause of Morris's suspension because Spears's investigation was an intervening, superseding cause. We disagree.

Proximate cause requires only "some direct relation" between the injury asserted and conduct alleged and excludes only those "link[s] that are too remote, purely contingent, or indirect." *Staub*, 562 U.S. at 419 (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). A jury could reasonably find that Higginbotham's proposal to suspend Morris directly related to Spears's ultimate decision to suspend her. In his written decision, Spears explicitly noted

that he was approving the suspension "as proposed by Ms. Higginbotham." J.A. 395.

The closer question is whether Spears's investigation was a superseding cause—that is, a "cause of independent origin that was not foreseeable," *Staub*, 562 U.S. at 420. The "mere conduct of an independent investigation" does not break the causal chain between a supervisor's bias and an adverse employment action. *Id.* at 421. Rather, the supervisor's biased recommendation may still influence the ultimate decision if the final decisionmaker "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*

A reasonable juror could determine that Higginbotham's report colored Spears's evaluation of the incident at hand. That report contained subjective observations that Morris had "difficulty getting along with others," was not "appropriately diplomatic," and had "acrimon[ious]" interactions with colleagues. J.A. 360-61. Spears's suspension decision repeatedly referenced Higginbotham's report, and in fact expressly agreed with a portion of her assessment that considered subjective factors. EPA does not argue that Spears had personal knowledge of the facts underlying Higginbotham's subjective observations. The case upon which the district court relied, *Hampton v. Vilsack*, is distinguishable. *See* 685 F.3d 1096. There, the allegedly biased supervisor played virtually no role in the decision to terminate the plaintiff. *See id.* at 1101-02. Here, although Spears considered some facts that were objectively verifiable—for example, the statements Morris made in her issue sheet—we cannot be confident that his decision was insulated from Higginbotham's subjective views. As a result,

we conclude that a reasonable jury could find that his decision was swayed by Higginbotham's subjective judgments.

In sum, Morris introduced enough evidence for a reasonable jury to find that (1) Higginbotham was motivated by racial animus when she recommended Morris's suspension, (2) the recommendation was intended to cause the suspension, and (3) the recommendation was a proximate cause of Spears's ultimate decision. We therefore reverse the district court's grant of summary judgment on Morris's claim that her suspension was motivated by racial discrimination. And because Morris's cat's-paw argument entitles her to proceed to trial on this claim, we need not review the district court's rejection of her alternative theory that Spears was independently motivated by racial bias. *See Wilson v. Cox*, 753 F.3d 244, 248-49 (D.C. Cir. 2014) (declining to consider an alternative theory of liability after concluding that an employment-discrimination plaintiff was entitled to a trial). At trial, the parties will have a "fresh opportunity" to present evidence about the motivation for Morris's suspension, and the "factfinder will assess and determine, in light of all of that evidence, whether the decision stemmed from a discriminatory motive." *Id.*

B

Finally, we address Morris's claim that EPA suspended her in retaliation for her complaints of employment discrimination. Title VII bars retaliation against employees who participate in a Title VII proceeding or oppose practices made illegal by Title VII. *See Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981). To establish either type of retaliation claim, an employee must have engaged in protected participation or opposition activity about which the

employer knew. *See Jones*, 557 F.3d at 679 (explaining that an employee's supervisors "could not have retaliated against him unless they had knowledge of his protected activity"). Morris contends that a reasonable jury could infer that both Spears and Higginbotham knew she had engaged in protected activity. We disagree and therefore hold that the district court properly granted summary judgment on Morris's retaliation claim.

According to Morris, Spears learned of her protected activity by reading her issue sheet and her attorney's written response to the proposed suspension. Those documents assert that Morris engaged in protected activity by articulating positions on behalf of OCR and engaging in debates about equal employment issues. But such job-related policy discussions are not protected. They do not amount to participation in a Title VII proceeding. Nor are they protected opposition activity, because they do not oppose any discrete practice that Morris reasonably could have believed discriminated on the basis of race, color, religion, sex, or national origin. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 134-35 (3d Cir. 2006) (holding that "basic [] advocacy" on an issue does not constitute opposition to an illegal employment practice). Labeling generalized policy disagreements a form of protected activity would risk insulating employees in civil rights roles from adverse employment action, because such debates are presumably part of their everyday duties. *See* BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 15-30 (5th ed. 2012) (explaining that employees who are "simply doing the job for which they were hired . . . may not have engaged in protected activity at all"). Because Morris points to no legitimate protected activity of

which Spears might have known, she cannot survive summary judgment on this basis.

Morris next argues that a reasonable jury could infer that Higginbotham knew Morris had participated in the Title VII process by asking to meet with an EEO counselor. In support, Morris contends that she told Higginbotham in late 2007 she would "not [] stand for any [] more discrimination or retaliation." Morris Decl. ¶ 35. Higginbotham also testified that in early 2008 she was aware that an OCR employee had asked to meet with an EEO counselor—a preliminary step in filing a Title VII complaint. And finally, also in early 2008, Morris told Higginbotham and other officials "multiple times" that "the Agency was required to provide an EEO counselor in a timely manner."[4] *Id.* ¶ 37. Taken together, Morris contends, her statements informed Higginbotham that Morris was the employee requesting EEO counseling.

Morris's argument is too speculative to defeat summary judgment. And an employee cannot survive summary judgment if a jury can do no more than "speculate" that her employer knew of her protected activity. *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). Morris never asserts that she told Higginbotham the request was hers. Nor does Morris contend that EPA in general was aware of her request, or that Higginbotham as a result could have known about it. *Contra Hamilton*, 666 F.3d at 1358. Instead, during this period, it was the Department of Energy—not EPA—that handled EEO counseling requests for employees in Morris's office. Moreover, Morris's statements would not necessarily have put Higginbotham on notice. To the contrary, Morris's comment

---

[4] Although Morris was entitled to meet with an independent EEO counselor from the Department of Energy, EPA had to provide funds for the counseling.

that OCR was "required to provide an EEO counselor in a timely manner" was hardly extraordinary in an office devoted to compliance with employment law. It thus reads as a senior manager's reminder to her superior of the office's general compliance obligations—not an admission that Morris wanted to meet with a counselor or was assisting another employee in obtaining such a meeting apart from her ordinary job duties. No reasonable jury could find that Morris's reminder notified Higginbotham that Morris was personally involved in the complaint process.

Because Morris has not introduced evidence sufficient for a reasonable jury to infer that either Higginbotham or Spears knew of any protected activity, the district court properly granted summary judgment to EPA on Morris's retaliation claim.

## IV

We affirm the district court's orders dismissing Morris's termination claims and granting summary judgment on her claim that her suspension was retaliatory. We reverse the district court's order granting summary judgment on Morris's claim that her suspension was motivated by racial discrimination and remand for further proceedings consistent with this opinion.