# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 11, 2019        Decided June 28, 2019

No. 18-5045

JAVIER A. MAYORGA,
APPELLANT

v.

CHRISTINE A. MERDON, ACTING ARCHITECT OF THE CAPITOL,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01604)

---

*Ellen K. Renaud* argued the cause and filed the briefs for appellant.

*Johnny H. Walker*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SRINIVASAN and WILKINS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Javier Mayorga, an employee of the Architect of the Capitol (AOC), brought an action against the Acting Architect of the Capitol, Christine A. Merdon, in her official capacity. Mayorga alleges the selecting officials at the AOC denied him a promotion on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The district court granted summary judgment to the AOC and Mayorga now appeals.

For the reasons below, we vacate the judgment of the district court and remand the case for trial, at which Mayorga will bear the typical burden in this single-motive case to establish that he would have been selected for the promotion but for the alleged improper motive.

## I.  Background

Because we are asked to determine whether Mayorga has put forth enough evidence at the summary judgment stage to proceed to trial on his Title VII claim, we set forth the facts in some detail.

## A.  Mayorga's Qualifications

Mayorga emigrated to the United States from Nicaragua in 1990 and, after almost ten years working in electronics, earned a degree in Network Management from Stratford University. Upon graduating in 2003, Mayorga worked part-time as a heating, ventilation, and air conditioning (HVAC) Service Technician at TK Service before he was hired as a full-time Control Service Technician at Advanced Power Control, where Mayorga was to troubleshoot network and electronic problems for over two years.

Since 2007 Mayorga has been employed at the AOC, a federal agency that operates and maintains certain buildings and historic monuments in the District of Columbia, such as the Capitol, the Capitol Visitor Center, and the Supreme Court. At all relevant times during his employment at the AOC, Mayorga worked primarily on the Capitol and on the Visitor Center as an Electronic Industrial Controls Mechanic in the Capitol Superintendent's Office. In this role, he is responsible for maintaining the building automation system (BAS), which comprises multiple systems, including HVAC, lighting, elevators, electrical monitoring, generators, and utility metering.

Mayorga has received numerous awards at the AOC and his work was rated "Outstanding" in his previous two evaluations. He mentors other employees on building automation activities and a coworker, Clinton Johnson, has submitted a sworn declaration that Mayorga is "the most knowledgeable person in [electronic] Controls and on the BAS network" that Johnson had met in his ten years working for the AOC. Johnson also describes Mayorga as the "'go to guy' for almost everyone" and says Mayorga is "regarded as the person who can figure out a problem" when others cannot, including problems related to "fiber and switches."

In 2014 Mayorga responded to an announcement advertising two openings in different wage grades for Electronics Technicians in the Energy Management Control Systems (EMCS) Branch, a central office within the Planning and Project Management Division that performs maintenance and operation services for all buildings within the jurisdiction of the AOC. Either job would be a promotion for Mayorga. Of relevance here, the job descriptions for the two openings require the selectees to service both (1) the BAS and (2) the "AOC Building Automation System Network (BASnet)." The

selectees also would be responsible for "installing new network(s) in the buildings" and for installing, terminating, and testing fiber-optic cabling and for "operating and troubleshooting BASnet equipment, including but not limited to" certain ethernet routers and network switches.

A human resources specialist in the AOC compiled a list of approximately 35 candidates who were considered minimally qualified for each of the positions and presented the lists to the selecting official, Scott Bieber, a white male Supervisory Electronics Technician who oversees the EMCS branch and who would be the selectees' direct supervisor. Bieber subsequently chose two colleagues, Cliff Wallace and Terry Watson, to participate with him on the selection panel. Wallace, a white male, is Bieber's deputy in the EMCS Branch and refers to himself as the "BAS Net Manager" because he "manages the BAS for all buildings maintained by" the AOC; Watson, a white female, manages a separate group within the Planning and Project Management Division.

Mayorga alleges he has crossed paths with both Bieber and Wallace throughout their time working together at the AOC – but it appears these encounters were not wholly collegial: Mayorga claims that Bieber and Wallace made fun of his Hispanic first name, regularly calling him "Caviar" instead of Javier, and that Bieber mocks Mayorga's accent and interrupts him in meetings. Bieber and Wallace dispute this account of their behavior; Bieber denies ever having worked with Mayorga.

From the list of candidates he received from the human resources specialist, Bieber selected six, including Mayorga, for first-round interviews. In advance of the interviews, Bieber used an Excel spreadsheet to note each candidate's experience in seven areas, based upon his or her resume (*e.g.*, "BAS,"

"NETWORK," or "HVAC"). Although Mayorga's resume showed he had worked as an HVAC service technician for eight years and that he had a degree in Network Management, Bieber failed to credit Mayorga in either area. According to Mayorga, the panelists took notes during his interview but did not seem "interest[ed] to ask [him] questions" and did not "make eye contact" with him, instead shuffling their papers.

## B. The AOC's Decision

Of the six candidates interviewed, the panelists chose three for a second (and final) round of interviews. Mayorga was not among this group; instead, the panelists ranked Mayorga last of the six, in part they said because he failed during the interview to give detailed answers about his experience or skills. Bieber also claimed Mayorga seemed confused during the interview about what job he had applied for. Furthermore, Bieber asserted Mayorga did not have experience with the BASnet because "[i]t wasn't stated on his resume or it never came out in the interview"; he also said Mayorga had "very little" experience with ethernet and fiber-optic cables, and no experience with Cisco equipment. We refer to these latter skills collectively as ethernet/fiber/Cisco.

The AOC ultimately chose Ed Williams and John Coulter, two white males it claimed were most qualified, to fill the two positions. Williams would specialize in graphics and programming, Coulter in the network.[1] Williams was already working in EMCS as an Electronic Industrial Controls

---

[1] Bieber testified he wanted one candidate to focus upon networking and another upon graphics and programming, but Mayorga disputes this. The vacancy announcement indicates the AOC sought two candidates for similar roles, and Watson later testified networking is only "an add on, a bonus if someone has [it]."

Mechanic performing the same duties required of the selectee; hence the AOC explained he had experience well-suited for his new role. Coulter was employed in another AOC shop as an Electronics Mechanic prior to his selection and Bieber explained Coulter was a top choice because Coulter had worked in his previous role to "maintain the BASnet network infrastructure, to do all the fiber work, and to help configure Cisco switches." Bieber Deposition at 8 (cleaned up).

## C. Procedural History

After exhausting his administrative remedies, Mayorga sued the Acting Architect of the Capitol in her official capacity, alleging the AOC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, when it did not select Mayorga for promotion. *See* Title IV of the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1311, 1317(a)(2) (extending the protections of Title VII to the legislative branch of the federal government). The district court granted the AOC's motion for summary judgment, *Mayorga v. Ayers,* 281 F. Supp. 3d 182 (2017), holding Mayorga failed to provide sufficient evidence from which a jury could reasonably find the AOC's justifications for not hiring Mayorga were pretextual. *Id.* at 203. The court subsequently denied Mayorga's motion to reconsider its order and Mayorga filed a timely notice of appeal.

## II. Analysis

We review a grant of summary judgment de novo. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). In order to succeed on a motion for summary judgment, the moving party must show there is "no genuine issue of material fact." *Id.* "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that

are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Id.* (citation omitted). "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (citation omitted).

The principal question before us is whether, based upon Mayorga's proffered evidence, a jury reasonably could find the panelists did not select Mayorga for promotion because of his race or national origin.

## A. The Title VII Framework

Title VII permits a plaintiff to establish liability in either of two ways. *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012). He may bring a case pursuant to 42 U.S.C. § 2000e-2(a)(1) on what we have called a "single-motive" or "pretext" theory of discrimination, which requires him to prove the employer's improper consideration of a protected characteristic was a but-for cause of an adverse employment decision. § 2000e-2(a)(1) (prohibiting discrimination in employment "because of [an] individual's race, color, religion, sex, or national origin"); *Ponce*, 679 F.3d at 844. Alternatively, a plaintiff may advance a "mixed-motive" theory of liability pursuant to 42 U.S.C. § 2000e-2(m), which allows a plaintiff unable to establish but-for causation to prevail as long as he can show that unlawful discrimination was "a motivating factor" for the decision. *See* § 2000e-2(m) ("an unlawful employment practice is established when ... race, color, religion, sex, or national origin was a motivating factor"). Under the latter approach, the plaintiff's recovery is limited to declaratory relief, certain fees and costs, and an injunction not including "admission, reinstatement, hiring, [or] promotion." § 2000e-5(g)(2)(B). "Even though we have described but-for and mixed-motive cases as 'alternative ways

of establishing liability,' a plaintiff may proceed under both theories simultaneously." *Ponce*, 679 F.3d at 845. Mayorga's counsel clarified at oral argument that Mayorga brings only a single-motive claim and hence recognizes he must ultimately show that, but for the panelists' consideration of an improper factor, he would have been promoted.

Under either theory, if the record does not contain direct evidence that the adverse employment action "was caused by prohibited discrimination," then we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), which requires the plaintiff first to establish a prima facie case of discrimination; then, the employer can show its decision was taken for a "legitimate, nondiscriminatory reason." *Holcomb*, 433 F.3d at 895; *see also Ponce*, 679 F.3d at 845. Because the AOC does not dispute that Mayorga has established a prima facie case, and because it has offered a nondiscriminatory explanation for its decision to hire the other candidates (*i.e.*, that Mayorga lacked certain skills in comparison to them), the court's focus shifts to resolving the "central question" whether the "employer's asserted non-discriminatory reason was not the actual reason." *Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008). Put another way, when an employer provides a legitimate reason for its decision:

> The *McDonnell Douglas* framework ... disappears, and the sole remaining issue is discrimination *vel non*. At this point, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason. By "all of the evidence," we mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the

employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.

*Holcomb*, 433 F.3d at 896-97 (cleaned up). Mayorga relies upon the latter two kinds of evidence to argue the AOC's proffered explanation is pretextual: He (1) challenges its claims that he lacks BASnet experience and that he was confused about what role he had applied for and (2) puts forth examples of discriminatory statements made by two of the panelists prior to the promotion decision.

## B. Qualifications-Related Challenges

Although Mayorga may attack the AOC's decision not to hire him by showing he is "significantly better qualified" than one of the chosen candidates, a plaintiff in a Title VII case is "expressly *not* limited to comparing his qualifications against those of the successful applicant; he may seek to expose other flaws in the employer's explanation, including, *inter alia*, showing the employer has misstated his qualifications." *Holcomb*, 433 F.3d at 897 (cleaned up). Mayorga may, therefore, rebut the AOC's claim that Williams and Coulter were more qualified by proffering evidence that the selecting officials knowingly understated Mayorga's qualifications, making their decision pretextual.

In order to "survive summary judgment based solely on evidence of pretext," the evidence must be "such that a reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015). For example, as we said in

*Aka v. Washington Hospital Center*, 156 F.3d 1284, 1295 (D.C. Cir. 1998),

> if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it. Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination.

On appeal Mayorga emphasizes two alleged misstatements by Bieber that would permit a jury to infer his explanation is pretextual – that is, that the misstatements were "too obvious to be unintentional," *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996): (1) Bieber incorrectly said Mayorga had no experience with the BASnet; and (2) Bieber said that during the interview Mayorga allowed as how he was unaware of what position he had applied for. The AOC denies these allegations and counters that, even if Mayorga were to succeed in them, he still cannot show the outcome would be different because he does not have sufficient experience in ethernet/fiber/Cisco.

### (1)   BASnet experience

Mayorga first alleges Bieber misstated Mayorga's experience with the BASnet when he testified that Mayorga "does not have experience with that. That's only limited to my [Bieber's] shop." Mayorga points out that his resume showed he had experience with the BASnet, performing tasks such as "[t]roubleshoot[ing] the network communication" and "[t]roubleshoot[ing] the entire BAS for properly [*sic*] operation"; most important, he also alleges Bieber was aware of his experience:

> Mr. Bieber knows [I have experience with the BASnet] because I have worked with his team on the BASnet. When the BASnet went down, I had to work with his subordinates to solve the problem. In my job, which is the same job that I held when I applied for the promotion, I work on the BASnet to control the technology in the Capitol building and the Capitol Visitor Center (CVC), which are the most complex and important buildings in the AOC.

Mayorga Declaration at ¶ 1. In response, the AOC stresses the distinction between a building-level BAS and the BASnet. It explains that each building within the jurisdiction of the AOC runs several systems (*e.g.*, HVAC, elevators) that comprise an internal BAS. Each internal BAS is then connected via fiber-optic cable to a network access switch which is, in turn, connected to a systemwide set of routers to the larger BASnet infrastructure. Hence, although "individual jurisdictions, such as the Capitol, House, and Senate jurisdictions, are responsible for other aspects of the BAS," these internal building-level systems "are not, themselves, the 'BASnet.'" According to the AOC, when Bieber talks about the "BASnet," he is referring to the "data-communications infrastructure interconnecting the Architect's thirty-one buildings and five off-site facilities"; in contrast, Mayorga's resume and declaration "plainly refer[] only to the building-specific BAS components."

Because Mayorga has proffered evidence undermining Bieber's explanation of what is considered BASnet experience, whether Mayorga has experience with the BASnet is a "genuine issue of material fact" to be resolved by a jury. Bieber claims only his "shop" (presumably the EMCS Branch) works on the "actual BAS net network" – yet Bieber said he hired Coulter for his network qualifications and Coulter, like

Mayorga, did not work in Bieber's shop. Indeed, both Coulter and Bieber testified that Coulter had experience with the "network side of [the building automation]" in his prior position and Coulter's resume said that in his previous job he was responsible for servicing and operating "highly complex, new or prototype systems including ... BASnet." Together, this evidence draws into question Bieber's claim that only employees in the EMCS shop have experience working with the BASnet.

More important, Wallace, "the BAS Net Manager" of the EMCS, has represented that Mayorga is "an operator" on "the BAS Net system," casting further doubt upon Bieber's statement that Mayorga lacks BASnet experience:

> **Q:** What is your working relationship with Javier Mayorga? Do you ever have an opportunity to work with him?
> **A:** I met him around 2008 when I started working in the EMCS shop, and he's an operator on the system. I mean, if he had questions he would call me. If he had –
> **Q:** Operator on what system?
> **A:** On the BAS Net system.

Although the district court addressed Wallace's testimony by distinguishing between "operating" on the BASnet system and "networking" on it,[2] on appeal the AOC does not assert this distinction, instead claiming Mayorga lacks BASnet

---

[2] 281 F. Supp. 3d at 192 ("Although Wallace testified that the plaintiff was an 'operator' on the 'BAS Net system,' he also testified that he thought the plaintiff did not have 'networking' experience on the BAS").

experience but failing entirely to address Wallace's testimony. A jury could therefore reasonably find that Mayorga – whose resume displayed his degree in Network Management and his experience in "[t]roubleshoot[ing] the [BAS] network communication" – had the BASnet experience sought by the panel.

Of course, if the jury were to conclude that Mayorga had experience in the BASnet, then Mayorga would still have to put forth sufficient evidence to enable the jury to find Bieber's misstatement was more than an honest mistake – *i.e.*, evidence showing Bieber did not "honestly believe[]" Mayorga lacked BASnet experience. *Fischbach*, 86 F.3d at 1183. Although Mayorga did not provide much detail about how he helped the EMCS team troubleshoot problems arising from the BASnet, we think a jury could nonetheless credit Mayorga's testimony that he worked with Bieber's team and infer Bieber knew Mayorga had the requisite BASnet experience. Combined with the evidence above suggesting that employees outside of the EMCS Branch also work on the BASnet, Mayorga has done more than "merely state a disagreement with, or disbelief of" Bieber's explanation, *Mayorga*, 281 F. Supp. 3d at 194, 197-98; from his proffered evidence, a jury may well determine Bieber's assertion that Mayorga had no BASnet experience was "not only a mistaken one in terms of the facts, but a lie." *Aka*, 156 F.3d at 1293.

### (2)   Knowledge of the job position

The second "misstatement" Mayorga calls to our attention is Bieber's claim that during the interview Mayorga was confused about what job he was applying for. According to Bieber, Mayorga said he "didn't realize [the interview] was for [the EMCS] shop." Wallace likewise testified that when Mayorga walked into the interview, Mayorga said, "I thought

this was a job in engineering," and, "I didn't mean to apply for this, so."

These accounts are in some tension with Mayorga's resume, which states his objective was to "achieve meaningful employment with the Office of Planning and Project Management as an Electronic[s] Technician," the job title listed in the vacancy announcement. Mayorga also objected vehemently to Bieber's and Wallace's statements in his sworn declaration: "That is a lie. I never said that or anything like it.... It was very clear on the vacancy announcement what the job was and I filled out the form knowing what the job was."

The only response the AOC makes on appeal is to belittle this dispute as one about a "tangential issue." We are not so quick to discount it, however; Mayorga's evidence must be viewed at this stage in the light most favorable to him, which is to say, tending to demonstrate that Bieber and Wallace manufactured reasons after the fact for not having hired him. *See Tolan v. Cotton*, 572 U.S. 650, 651 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). A jury may reasonably find that Bieber and Wallace fabricated Mayorga's alleged statements in order to bolster their pretextual explanation that Mayorga was not as qualified as the other applicants. *See DeJesus v. WP Co. LLC*, 841 F.3d 527, 535 (D.C. Cir. 2016) (explaining a jury may find pretext in part because an employer's action may "suggest[] an overall lack of forthrightness").

### (3)    Ethernet/fiber/Cisco skills

Finally, the AOC urges us to find, as the district court did, that even if Mayorga did have BASnet experience, "it would not have altered the outcome of the selection" because

Mayorga lacked experience with ethernet/fiber/Cisco. Appellee's Br. at 20; 281 F. Supp. 3d at 198.

The AOC's brief and the record, however, indicate that the BASnet includes fiber-optic cables and Cisco switches – so if Mayorga indeed had experience with the BASnet, then we think a jury may reasonably find he had experience with its integral components. *See* Appellee's Br. 12-13 (describing "Cisco network equipment" and "Ethernet and fiber-optic cables" as "two key components of the network that EMCS was responsible for maintaining"). In fact, Bieber's own description of the BASnet references each of the relevant technologies: "The BASnet is connected to each building-level BAS system via a *fiber-optic cable* to a building-level *switch*. The building-level *switch* is then connected to several access *switches* within that building, again using *fiber-optic cables*. An *Ethernet cable* then connects those *access switches* to the routers." Bieber Deposition at 8 (emphasis added). In addition, Mayorga has a degree in Network Management and, as described above, Mayorga's coworker submitted a declaration that Mayorga troubleshoots problems related to "fiber and switches."[3] This evidence is sufficient to raise a genuine question of material fact regarding whether Mayorga has the requisite skills in ethernet/fiber/Cisco.

---

[3] Mayorga also asks us to consider that his application for the position indicates he had experience "implementing or troubleshooting" "Cisco switch hardware," "fiber infrastructure," and "Ethernet cable infrastructure." Mayorga has forfeited this evidentiary argument, however, because he failed to raise it in the district court. *See Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007) (declining to consider record evidence with respect to a nonmovant's claim of pretext because she had "never argued that the various discriminatory acts alleged in her hostile work environment claim ... were further evidence of pretext").

## C.  Other Instances of Discrimination

We come now to consider Mayorga's other evidence of discrimination.  As we said in *Holcomb*, a plaintiff in a Title VII case is "not limited to challenging the employer's explanation; [h]e can also avoid summary judgment by presenting other evidence ... that permits an inference of discrimination," such as "discriminatory statements by the employer, or other attitudes suggesting the decision maker harbors discriminatory animus."  433 F.3d at 899.

Mayorga contends that Bieber's name-calling ("Caviar" instead of Javier) and his mockery of Mayorga's accent could lead a reasonable jury to conclude the panel denied Mayorga a promotion for improper reasons.  The AOC raises three objections.  First, it claims Mayorga cites only his own "self-serving" testimony as evidence of Bieber's discriminatory attitude.  Second, the AOC contends Mayorga's testimony does not show that Bieber himself, rather than other employees, mocked Mayorga's accent and called him "Caviar."  Finally, even if Mayorga were to show that Bieber made discriminatory remarks, the AOC says Mayorga's accusations are "legally deficient" because the remarks bear no nexus to the promotion decision.

We are unconvinced by the AOC's responses.  Its first argument is a mere makeweight:

> [T]here is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.  After all, evidence a party proffers in support of its cause will usually, in some sense, be "self-serving."  It is nonetheless beyond

> question as a general proposition that parties, like other fact witnesses, are legally competent to give material testimony. Indeed, in many kinds of cases, parties are the key, or even sole, witnesses. To the extent the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury – not the court on summary judgment – to discount it accordingly.

*Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) (cleaned up). In this instance, the question whether Bieber called Mayorga "Caviar" and mocked his accent hinges upon Mayorga's and Bieber's credibility, "an issue that is quintessentially one for the finder of fact." *Aka*, 156 F.3d at 1299. Mayorga's testimony is therefore precisely the kind of evidence upon which, when combined with all the other evidence, a jury may base a verdict in his favor. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

As to the AOC's view that Mayorga's testimony cannot be interpreted to show Bieber was involved in calling Mayorga "Caviar" or in mocking Mayorga's accent, we disagree. When asked in his deposition whether he spoke to Bieber "about the insults," Mayorga answered no because "Bieber was one of the person [*sic*] who was talking." Moreover, when asked whether he had "ever directly heard Mr. Bieber, Mr. Wallace, [or another employee], as you say, 'talk trash' about [him]," Mayorga answered that "they call me, straight out to my face, 'Caviar.'" Furthermore, Mayorga clearly testified that Wallace has previously called him "Caviar" – a particularly significant accusation because Wallace was on the selection panel.

18

Finally, we reject the AOC's argument that mockery about Mayorga's name and accent does not permit a jury to infer discrimination because Mayorga has not explained how the remarks relate to the decision at issue. Although "an isolated race-based remark unrelated to the relevant employment decision could not, without more, permit a jury to infer discrimination, we have not categorically labeled such comments immaterial." *Morris v. McCarthy*, 825 F.3d 658, 669-70 (D.C. Cir. 2016) (cleaned up). To be sure, Mayorga's argument would be stronger if he had drawn a direct connection between the discriminatory name-calling and the selection decision, but we have been clear that disparaging comments of the sort Mayorga describes are "nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks." *Id*. at 670. A jury may therefore consider this evidence alongside the other evidence in this case to determine whether Mayorga has met his burden.

In sum, drawing all inferences in Mayorga's favor, a compelling narrative emerges, *cf. id.* at 671: Bieber knew Mayorga worked on the BASnet because Mayorga had at least once worked with the EMCS team in order to troubleshoot the system. Thereafter, Bieber listed two job openings for his shop and worked with two other panelists to make the selection decision; two of the panelists, including Bieber, had regularly called Mayorga "Caviar" instead of Javier and mocked his accent. Prior to the interviews, Bieber did not give Mayorga credit for skills readily apparent on Mayorga's resume. After rejecting Mayorga for the position, Bieber justified his decision in part by explaining Mayorga did not have BASnet experience, which was limited to only his shop – yet the panel recommended and the AOC hired a candidate for the "network" role who also did not work in Bieber's shop. Bieber's claim that Mayorga did not have the requisite BASnet

experience is further contradicted by that of Bieber's deputy in the EMCS Branch, who testified that Mayorga is an "operator" on the BASnet. Bieber then falsely accused Mayorga of not knowing what job he was applying for.

Viewed in this light, a reasonable jury could be "quite suspicious" about the sincerity of the reasons given for Mayorga's not having been selected. *Id*. Of course, although a jury might instead find the AOC's justifications genuine, "[r]esolving such conflicting inferences is precisely the type of function we leave to the jury, not to a judge ruling on a summary judgment motion." *Id*. at 672.

## III. Conclusion

We conclude Mayorga has proffered evidence from which a jury could infer the AOC discriminated against him. Because Mayorga argues his case as a single-motive claim and at oral argument forfeited any potential mixed-motive claim he could have made, he bears the burden of showing the alleged animus was a but-for cause of the decision not to promote him. *See Ginger v. D.C.*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).

The judgment of the district court is vacated and the case remanded for trial.

*So ordered*.